408 F.2d 461
 Lillian LANDORF and William M. Landau, as Surviving Executors of the Last Will and Testament and Codicil Thereto of Sam Landorf, Deceased
v.
The UNITED STATES.
 No. 44-67.
 United States Court of Claims.
 March 14, 1969.
 
 Robert E. Fischer, New York City, attorney of record, for plaintiffs. Robert K. Ruskin and Lowenthal, Ruskin, Landau & Fischer, New York City, of counsel.
 Edna G. Parker, Washington, D. C., with whom was Asst. Atty. Gen. Mitchell Rogovin, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.
 OPINION
 LARAMORE, Judge.
 
 
 1
 This is an estate tax case. Plaintiffs, Lillian Landorf and William M. Landau, are the surviving executors of the last will and testament of Sam Landorf,[1] a resident of New York City, who died on January 8, 1963. The facts have been stipulated and in summary are as follows:[2]
 
 
 2
 Sam Landorf and Company, Inc., a New York corporation with its principal offices in New York City, was engaged in the manufacture and sale of children's clothing. At his death, decedent was a stockholder and president of the corporation. He held 500 shares of the outstanding Class A common (voting) stock and William Glottstein, executive vice-president of the corporation, held the remaining 500 shares of Class A common stock. The outstanding shares of Class B common (non-voting) stock were held by decedent's wife, Lillian, and his two sons.
 
 
 3
 Effective November 9, 1959 (several years before Mr. Landorf's death), the United States Life Insurance Company issued a non-contributory group life insurance policy to the company. It provided, in part, that the corporation would pay monthly premiums for insurance on the lives of designated classes of employees. The amount of the premium was based on the cost of one-year term insurance for each employee covered. Coverage was provided for a one-year period with the right of the corporation, as policyholder, to renew the insurance for another year, subject, of course, to minimum employee participation requirements. Each employee received a "certificate" to evidence his participation in the plan. The policy did not have any cash surrender or loan value.
 
 
 4
 Decedent, a corporate officer, received a certificate of participation (sometimes referred to as a policy). He designated his wife as the beneficiary of his $200,000 policy coverage.
 
 
 5
 As originally issued, the policy provided that "this policy and benefits hereunder are `non-assignable'". On December 7, 1960, approximately one year after the policy was issued and two years before decedent died, the policy was amended by an agreement between the insurance company and the policyholder, Sam Landorf Company, Inc. Decedent signed the agreement on behalf of the corporation, as its president. This agreement declared the original non-assignment provision null and void, and substituted a new provision which reads, in part:
 
 
 6
 This policy is further amended to provide that no assignment of the policy or the benefits thereunder shall be binding upon the Company unless in writing and until it is filed with the Company's Home Office in New York, N. Y. The Company assumes no responsibility for the validity of any assignment.
 
 
 7
 On March 1, 1961, some three months later, decedent executed the insurance company's form titled "Absolute Assignment of Insurance Under the Group Policy" and thereby gratuitously assigned the policy to his wife. It provided that Sam Landorf
 
 
 8
 designates as beneficiary and assigns, transfers and sets over the insurance on his life provided under the above numbered group policy, together with all additional insurance that may be provided in the future and together with all rights, all sum or sums of money, interest, benefits and advantages whatsoever in connection therewith now due or hereafter to become due to the undersigned by virtue thereof unto Lillian Landorf (hereinafter called the assignee).
 
 
 9
 The form also states that the insurance company "does not guarantee the validity of any assignment." Six days later, the assignment form was countersigned by an officer of the insurance company, and thereafter it was filed in the insurance company's home office. At no time, however, did the insurance company challenge the validity of the assignment.
 
 
 10
 In the years prior to his death, the decedent made gifts of money and insurance to his wife and son.[3] None of these other policies was a group policy, and none of the proceeds of these policies is involved in this suit.
 
 
 11
 On December 17, 1962, decedent was examined by his physician and he was found to be in good health. Soon thereafter, he and his wife left for a vacation cruise during which he suffered a coronary thrombosis and died. He did not have a prior history of heart disease.
 
 
 12
 Mrs. Landorf, as beneficiary, received the $200,000 proceeds of the group policy from the insurance company. The executors of the estate, however, excluded the proceeds from the decedent's gross estate subject to Federal estate taxes. Upon audit, the District Director of the Internal Revenue Service did include the proceeds in the taxable estate (on the basis of sections 2035 and 2042 of the Internal Revenue Code, as amended), and a deficiency was assessed.
 
 
 13
 Plaintiffs paid the $28,000 deficiency (plus $3,118.67 interest) on February 8, 1966. On March 15, 1966 plaintiffs filed a claim for refund of this payment on behalf of the estate. More than six months elapsed without any action by the District Director, and in February, 1967, plaintiffs commenced this suit (pursuant to section 6532(a) (1)).[4]
 
 
 14
 Basically, plaintiffs argue that the decedent was neither a legal nor equitable owner of the policy at the time of his death because he had irrevocably and absolutely assigned to his wife his entire title to, and his interest and rights in, both the policy and the proceeds, at a time when he was 60 years of age, in excellent physical health and without any prior history of serious illness. At the time of his death, therefore, he did not have any incident of ownership in the policy, nor had he assigned the policy in contemplation of his death.
 
 
 15
 Several aspects of this case involve issues of first impression. We decide only those questions raised by the parties and only those that are essential to our conclusion. On the basis of the specific facts before us, we conclude that plaintiffs are entitled to recover a refund.
 
 
 I. Section 2042
 
 
 16
 Under section 2042(2), life insurance proceeds receivable by any beneficiary other than his executor are includible in the decedent's gross estate, if immediately prior to his death he possessed any incident of ownership exercisable either alone or in conjunction with another person.[5] Treasury Regulation section 2042-1(c) (2) repeats almost verbatim the legislative history of section 2042,[6] and explains the term of art "incidents of ownership" as follows:
 
 
 17
 For purposes of this paragraph, the term "incidents of ownership" is not limited in its meaning to ownership of the policy in the technical legal sense. Generally speaking, the term has reference to the right of the insured or his estate to the economic benefits of the policy. Thus, it includes the power to change the beneficiary, to surrender or cancel the policy, to assign the policy, to revoke an assignment, to pledge the policy for a loan, or to obtain from the insurer a loan against the surrender value of the policy, etc. Similarly, the term includes a power to change the beneficiary reserved to a corporation of which the decedent is sole stockholder.
 
 
 18
 The group policy in this case gave each insured employee the right to designate a beneficiary; the right to elect among optional modes of settlement (to be agreed upon by the insured and the insurance company); the power to assign the policy; and in the event of termination for any reason, the right to convert the group coverage into an individual life insurance policy of equal amount, without providing evidence of insurability. Defendant argues that, in addition to these rights, decedent had a right to surrender or cancel the group policy and also that he had a reversionary interest in the policy in excess of five percent of the value of his policy. Defendant argues that if, despite a transfer of all of his rights in the policy, the decedent nevertheless retained any one of these incidents of ownership, either because applicable local law proscribes the assignment of a particular right or for any other reason, all of the proceeds of the policy are includible in the taxable gross estate.
 
 
 (a). Right to convert the term insurance to ordinary life insurance
 
 
 19
 The problems raised by the Federal estate tax consequences of an absolute, written assignment of all rights in a group life insurance policy have been considered by many commentators.[7] These same problems, however, have not been resolved by Congress, and they have been considered by very few courts.
 
 
 20
 In the Supreme Court's most recent decision in this area, Commissioner of Internal Revenue v. Noel's Estate, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965), it held the proceeds of flight insurance includible in the decedent's estate and rejected the wife's contention that the decedent had assigned the policies to her immediately prior to the flight which proved fatal to her husband. The Court found that a true assignment had not been made. Mrs. Noel paid for the insurance and received the policies from the sales clerk. The Court, however, noted that the contract terms stated that the policies could not be assigned without a written endorsement by the company and none was made. The Court concluded:[8]
 
 
 21
 Nothing we have said is to be taken as meaning that a policyholder is without power to divest himself of all incidents of ownership over his insurance policies by proper gift or assignment, so as to bar its inclusion in his gross estate under § 2042(2). What we do hold is that no such transfer was made of the policies here involved. * * *. [Emphasis added; 380 U.S. at 684, 85 S.Ct. at 1241.]
 
 
 22
 Under Treasury Regulation section 2042-1(c) (5) (and Revenue Ruling 68-334) we must, where appropriate, give effect to applicable state or local law in deciding whether the decedent possessed any incident of ownership. Specifically, we must look to the insurance and property law of the State of New York (which the parties agree is applicable) to determine whether an employee may assign his coverage and rights under a group life insurance policy, including the right to convert. Ultimately, the question of incidents of ownership is one of Federal tax law, but this decision, as the Regulations and Revenue Ruling state, may turn on state law. Cf. Morgan v. Commissioner of Internal Revenue, 309 U.S. 78, 80. 60 S.Ct. 424, 84 L.Ed. 585 (1940); Burnet v. Harmel, 287 U.S. 103, 110, 53 S.Ct. 74, 77 L.Ed. 199 (1932).
 
 
 23
 As a general rule, ordinary life insurance policies are assignable under New York law. Baginska v. Metropolitan Life Insurance Co., 163 Misc. 635, 296 N.Y.S. 502 (City Ct.1937); In re Pastore's Estate, 155 Misc. 247, 279 N.Y.S. 200 (Sur.Ct.1935); Cornell v. Cornell, 54 N.Y.S.2d 434 (Sup.Ct.1945), aff'd, 269 App.Div. 931, 58 N.Y.S.2d 216 (1945). Whether a group policy and its conversion privilege may be assigned, however, is unclear. Neither the courts of the State of New York nor its legislature has directed itself to these specific questions. The materials cited to us are ambiguous, and we have been unable to find any pertinent additional material. We fully recognize that this issue is suitable for decision by the local jurisdiction involved, but in the absence of either guidance from the State legislature or a ruling on this question by the New York State Court of Appeals (or any other New York State court), we will attempt to navigate these uncharted waters. Cf. Commissioner of Internal Revenue v. Bosch's Estate, 387 U.S. 456, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967).
 
 
 24
 Plaintiffs have argued that section 166 of the New York Insurance Law, McKinney's Consol.Laws, c. 28, recognizes the right to assign a group policy. That provision, however, is wholly inapplicable. It protects the proceeds of life insurance policies by exempting them from claims by creditors of the insured, if a transfer of the policy is not in fraud of creditors. The section cited neither approves nor disapproves assignments of life insurance. Assuredly, it does not establish that the policy (or the conversion privilege) is assignable.
 
 
 25
 Defendant's arguments, however, are equally unconvincing. It contends that the conversion privilege is personal to (and exercisable only by) the insured; therefore, it cannot be assigned under New York law.
 
 
 26
 Section 161 of the Insurance Law specifies mandatory provisions that must be present in a group life insurance policy. Defendant argues that subdivision (b) of subpart (1) prevents any assignment, whatsoever, of a group policy, and that subdivision (e) of the same subpart prevents the assignment of the conversion privilege (even if the policy is otherwise assignable).
 
 Subdivisions (b) and (e) provide, in part:
 
 27
 (b) A provision that the rights of the policyholder or of any insured or beneficiary thereunder shall not be affected by any provision other than one contained in the policy or the riders or endorsements thereon or in the amendments thereto signed by the policyholder and the insurer, * * *.
 
 
 28
 (e) A provision to the effect that in case of the termination, for any reason whatsoever, of the employment of any employee while insured under a group policy issued to his employer * * * such employee * * * shall be entitled to have issued to him by the insurer, without evidence of insurability, upon application made to the insurer within thirty-one days after such termination, * * * a policy of life insurance only, * * * in an amount equal to the amount of his protection under such group insurance policy at the time of such termination, * * *.
 
 
 29
 Subdivision (b) is a general statement that the insured-employee's rights cannot be affected by side agreements between the insurance company and the policy-holder-employer; it does not state that the insured cannot act to affect his own rights. It does recognize that the insurance company and the policyholder can agree to amend the policy. Defendant argues that the assignment executed by decedent was an agreement affecting his rights as an insured, but it was not signed by the policyholder. The amendment to the policy, however, merely granted the employee an additional right (not specifically required by the statute but also not prohibited by the statute). It adopted a procedure for effecting an assignment and removed the contractual provision which barred assignment. This added to the employee's rights, and we have not been shown how the statutory provision prohibits either this amendment to the contract, or an assignment pursuant to such amendment where the assignment did not affect policy rights available to the owner thereof. We rely on the general rule under New York law that life insurance policies are assignable; we have not been shown that the laws of New York preclude the assignment of a group life insurance policy.
 
 
 30
 Defendant's argument under subdivision (e) is more complex. It is that the right to convert is personal to the insured because the policy to which he converts is "issued to him," and the policy says that the "insured" can opt to have a one-year term policy before obtaining an ordinary life insurance policy.
 
 
 31
 Defendant says that the New York cases clearly establish that the right is personal. In fact, however, they do not even consider the questions now before us, and none involves an assigned policy. Instead, these are cases where the insured employee dies within the 31-day period without having exercised his conversion privilege. Within the remaining portion of the 31-day period, a beneficiary tries to exercise the right to convert. The New York courts have held that the unexercised privilege is valueless once the insured dies and, therefore, the beneficiary has no right to convert the policy to an ordinary life policy and then obtain the proceeds from such new policy. Similarly, claims that the old policy is extended for the 31-day period have been rejected because this is not a grace period for the old policy; it is merely an option period during which the policy can be converted.[9] These cases do not stand for the proposition that the right to convert is personal and non-assignable. They hold that an insured, who is also the owner of the rights under the policy, must be alive when the conversion privilege (that becomes available on termination of employment) is exercised.
 
 
 32
 The statutory provision and the policy which has a section based on this provision provide that the insured may have an ordinary life policy issued to him if he exercises his right to convert. This right to a new policy, of course, if properly assigned, becomes one of the rights of the assignee. Moreover, we recognize that non-group term life insurance policies frequently permit conversion to ordinary policies. These policies are no less assignable because they are group rather than individual term insurance. Decedent absolutely assigned whatever rights he had. The right to convert the policy is thereafter available to the assignee, and we have been shown nothing to prove that an assignee cannot exercise the right to convert (other than defendant's strained reading of the statute).
 
 
 33
 The right to convert is designed to protect the employee's insurability and permits him to continue his coverage in favor of those to whom he wants the proceeds paid. An assignment of this right merely assures the assignee of continued coverage of the insured. Landorf's assignment permitted his wife to plan her own estate on the basis of continued coverage and control of the proceeds.
 
 
 34
 The conversion privilege cannot be deleted from the policy or waived; but this case does not involve either waiver or an attempted deletion. Revenue Ruling 68-334, in its example 2 (see footnote 8, supra), recognizes that the entire policy and the conversion privilege is assignable unless either the group policy or the local law prohibits an assignment of the conversion privilege. We do not find any stated prohibition against assignment in either subdivision (b) or (e) of section 161.
 
 
 35
 Defendant has not shown that the insurance company would have refused to honor an attempted conversion by the assignee or that the assignee could not exercise the privilege. We cannot read the suggested prohibition into either of the sections relied on by defendant.
 
 
 36
 Our conclusion, therefore, is that local law neither prohibits nor approves assignments of group policies. As noted above, there is no decision of the New York Court of Appeals on this point. We can find nothing to prohibit an assignment and, therefore, conclude that group life insurance policies are no less assignable under New York law than ordinary life insurance policies.
 
 
 37
 This determination, however, is merely the first step of our analysis. We must now find whether, under both local law and the Federal tax laws, decedent possessed any other right in the policy or proceeds which may be deemed an incident of ownership.
 
 
 38
 
 (b). Right to terminate employment
 
 
 
 39
 Defendant argues that decedent could at any time terminate his employment and thereby force the assignee to exercise the conversion privilege. The decedent's ability to terminate his employment, however, did not control his assignee's rights in the policy because, as we said above, Mrs. Landorf could exercise the conversion privilege and obtain the same amount of coverage. The only adverse effect on the assignee would be that she must pay a higher premium for the new policy.
 
 
 40
 A similar argument was made in Estate of John C. Whitworth, 22 T.C.M. 177 (1963). Defendant argued that a transfer was revocable (under section 2038) because the employee could at all times cease his employment and terminate the rights to pension benefits that he had tranferred to his wife. The court thought that this argument leads to an absurd result; it found that Congress could not have intended to make the right to terminate one's employment a power to revoke within section 2038. In our case, even if Mr. Landorf had quit, the only effect on the policy would be to make the conversion privilege exercisable. Moreover, we do not believe that Congress intended to include the power to terminate employment, a right which everyone can exercise at any time, to be an "incident of ownership" in property simply because the property involved is somehow related to the employment. The exercise of the right to terminate employment in no way derogates the rights in the property assigned. Accordingly, we find that decedent's right to terminate his employment is not an incident of ownership within the meaning of section 2042.[10]
 
 
 (c). Reversionary interest
 
 
 41
 Defendant argues that, under section 2042(2), decedent had a reversionary interest in the proceeds of the policy. A reversionary interest in either the policy or the proceeds of the policy, whether it arises by virtue of the terms of the policy or another instrument, or by operation of law, is an incident of ownership, if immediately prior to the death of the decedent, the value of the reversionary interest exceeds five percent of the value of the policy. "Reversionary interest" is defined in section 2042(2) as including
 
 
 42
 a possibility that the policy, or the proceeds of the policy, may return to the decedent or his estate, or may be subject to a power of disposition by him.
 
 
 43
 Defendant argues that the decedent had a reversionary interest because, under the terms of the policy, the proceeds would have been paid to his estate if his wife had predeceased him. This would have occurred because his wife was the sole designated beneficiary under the policy; there were no contingent beneficiaries who would take the proceeds if the wife had predeceased the insured. This becomes important because the group policy provided that in the absence of a designated beneficiary who survives the employee the proceeds of the policy shall be paid to the executors of the employee's estate. Therefore, argues defendant, there is a possibility that the proceeds of the policy will return to the decedent's estate, and that possibility is an incident of ownership in the policy. (Defendant asks the court to return the case to a trial commissioner for a factual determination of whether the reversionary interest represents five percent of the value of the policy.)
 
 
 44
 The government's argument presupposes that the insured retained some rights under the contract as an "employee". As we have decided above, all of the rights to which he might have been entitled were assigned to his wife. Therefore, any proceeds originally payable to the "employee" are, subsequent to the assignment, payable to the assignee. If the wife had predeceased the decedent, the proceeds of the policy would be payable to her estate because, upon the subsequent death of the employee, the proceeds originally payable to the employee's estate instead would be paid to the assignee's estate. We find, therefore, that the decedent did not retain any reversionary interest under the terms of the policy.
 
 
 (d). Rights to revoke the assignment and to terminate the policy
 
 
 45
 We turn now to the last of defendant's arguments on this issue. They are that the decedent could have acted either together with his wife to revoke the assignment, or together with Mr. Glottstein, his co-stockholder, to cancel the entire group policy; these are rights exercisable in conjunction with another person and, therefore, incidents of ownership within the meaning of section 2042.
 
 
 46
 Defendant makes the conclusory statement that decedent probably could have revoked the gratuitous assignment by himself under local law and that, in any event, he could have revoked the assignment together with his wife. Defendant relies on Frey v. Feller, 127 N.Y.S.2d 302 (Sup.Ct.1953);[11] and Helvering v. City Bank Farmers Trust Co., 296 U.S. 85, 56 S.Ct. 70, 80 L.Ed. 62 (1935); Commissioner of Internal Revenue v. Estate of Karagheusian, 233 F.2d 197 (2d Cir. 1956); Estate of Goldstein v. United States, 122 F.Supp. 677, 129 Ct.Cl. 264 (1954), cert. denied, 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955); Hall v. Wheeler, 174 F.Supp. 418 (S.D.Maine, 1959).
 
 
 47
 It is, of course, possible for the assignee and the assignor to agree to revoke the assignment. If, however, this possibility is sufficient to establish an incident of ownership within section 2042 (2), it is difficult to see how any assignment, no matter how complete and irrevocable, could effectively remove property from the provisions of section 2042.
 
 
 48
 The cases relied on by defendant to support its proposition are inapposite. They stand only for the general proposition that if a decedent can exercise some affirmative or negative control over the policy (whether alone or in conjunction with someone else) the proceeds of the policy are includible in his estate. In these cases, however, the powers of control are obvious and they are in no sense comparable to the possibility posed by defendant, i. e., that the assignee and assignor could agree to revoke the assignment.
 
 
 49
 In Helvering v. City Bank Farmers Trust Co., supra, the settlor established an irrevocable trust to which property was transferred but "reserved the right to modify, alter, or revoke it, in whole or in part, or to change any beneficial interest; any such revocation or alteration to be effected with the written consent of the trustee and her husband * * *." (296 U.S. at 87, 56 S.Ct. at 71.)
 
 
 50
 In the Karaghuesian case, the wife applied for insurance on her husband's life with all rights of ownership vested in her during her lifetime, in her daughter during her lifetime, and then in the husband's executors, administrators or assigns. The wife executed a trust and made an absolute assignment of the policy to the trustee. The trust provided, in part, that she "could modify the trust or alter it in any manner or revoke it in whole or in part, with the written consent of Miran and Leila [her husband and daughter] or the survivor." (233 F.2d at 198-199)
 
 
 51
 In the Goldstein case, decedent requested a special "ownership" provision in the policy. It gave the beneficiary the power to exercise all ownership rights in the policy "except that during the lifetime of Louis Goldstein, the insured, his written consent must first be obtained. (122 F.Supp. at 678, 129 Ct.Cl. at 269)
 
 
 52
 Similarly, in Hall v. Wheeler, supra, the "policy reserved to the decedent the right to change the beneficiary, to assign the policy, to surrender or cancel the policy, to pledge the policy for a loan and to withdraw its cash surrender value." (174 F.Supp. at 419)
 
 
 53
 None of these cases supports defendant's argument.
 
 
 54
 Defendant's last "incident of ownership" argument is that the decedent, as president and owner of 50 percent of the voting stock of the corporation, could have surrendered or cancelled the policy by acting together with Mr. Glottstein (who owned the other 50 percent), and thereby terminate all rights under the contract, including those of the assignee. In addition, he had the power to prevent Mr. Glottstein from cancelling the entire policy. Defendant points out that Mr. Landorf, as president, signed the amendment which made the policies assignable. Moreover, he remained as president with power to cancel the policy (whether or not such cancellation would be wrongful). Equally damaging in defendant's view, is the fact that the policy limited the amount of coverage obtainable in the event of a termination of the entire policy to $2,000 and, therefore, the decedent retained power to control the amount of insurance which an exercise of the conversion privilege could obtain (either $2,000 or $200,000).
 
 
 55
 By virtue of the special stock-ownership position of Mr. Landorf, he had rights which an insured employee generally would not have. This issue is, we admit, a very close question. However, we are not convinced by defendant's arguments because we cannot conclude that Congress intended to impose special difficulties on the insured-employee who is also a stockholder of the corporation. If the mere ownership of stock in the corporation is a barrier to assignability, defendant's argument would be equally applicable to employees with substantially lower percentages of ownership because they, too, could terminate the policy if they were to obtain the agreement of other stockholders. In effect, the ownership of a small percentage of stock (as is frequently the case) combined with the possibility of agreement among sufficient stockholders to terminate the policy would prevent the assignment of any employee group policy rights. The net effect, we believe, is beyond the pale of what Congress intended should be the thrust of section 2042. This may not be the case, however, if the corporation is wholly-owned or if it is proved that a particular stockholder has control over a sufficient number of other stockholders to effectuate a cancellation at his will. Of prime importance is the fact that there is no proof that this is the situation in our case. Defendant has not proved that decedent could have caused the corporation to act at his will. The mere fact of stock ownership is insufficient. We conclude that decedent did not have this alleged incident of ownership.
 
 
 56
 Defendant states, in a footnote, that a failure to pay the premium for a particular employee would terminate that employee's coverage. There is no proof, however, that the insurance company would refuse to accept a payment of the premium by the assignee, and the record before us is inadequate for a determination that decedent had an incident of ownership on this basis.
 
 
 B. Section 2035
 
 
 57
 Alternatively, defendant contends that the proceeds of the policy are includible in decedent's gross estate because the assignment was a transfer in contemplation of death. Section 2035[12] includes transfers in lieu of testamentary dispositions if made prior to death in an attempt to avoid estate tax or for any other death-connected reason. United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931).
 
 
 58
 Any transfer, if in contemplation of death, is within section 2035. A special rule is applicable, however, if the transfer was within three years prior to the date of the decedent's death. In that circumstance, the transfer is rebuttably presumed to have been made in contemplation of death. The party opposing the payment of the estate tax must show, by a preponderance of the evidence, that the transfer was not made in contemplation of death. It is immaterial that the decedent absolutely transferred his entire title to, interest in or possession of the property. (See: Treas.Reg. § 20.2035-1 (a)).
 
 
 59
 Affirmative evidence of motives associated with life must be presented (First Trust & Deposit Co. v. Shaughnessy, 134 F.2d 940 (2d Cir. 1943), cert. denied, 320 U.S. 744, 64 S.Ct. 46, 88 L.Ed. 442; Vanderlip v. Commissioner of Internal Revenue, 155 F.2d 152 (2d Cir. 1946), cert. denied, 329 U.S. 728, 67 S.Ct. 83, 91 L.Ed. 630; Davidson's Estate v. Commissioner of Internal Revenue, 158 F.2d 239 (10th Cir. 1946); Garrett's Estate v. Commissioner of Internal Revenue, 180 F.2d 955, 17 A.L.R. 2d 780 (2d Cir. 1950); Slifka v. Johnson, 161 F.2d 467 (2d Cir. 1947), cert. denied, 332 U.S. 758, 68 S.Ct. 57, 92 L.Ed. 344), and the fact that the property is life insurance does not make the transfer necessarily in contemplation of death, especially if the taxpayer presents affirmative evidence to establish the existence of acceptable life motives. Estate of Hull v. Commissioner of Internal Revenue, 325 F.2d 367 (3d Cir. 1963); Estate of Aaron v. Commissioner of Internal Revenue, 224 F.2d 314 (3d Cir. 1955); Estate of Louis Richards, 20 T.C. 904 (1953). The proceeds of life insurance policies, however, may be includible in the gross estate under section 2035 if the policy was transferred in contemplation of death. (Treas.Reg. 20.2042-1(a) (2)). The issue in this case, as both parties state it, is whether plaintiffs have made the requisite showing of significant life motives.
 
 
 60
 The vagaries of each case must be closely examined, including the decedent's physical and mental condition "and all other attendant facts and circumstances" (Treas.Reg. § 20.2035-1) to determine whether a specific transfer was prompted by some death-oriented reason or by a life-motive. The phrase "contemplation of death," of course, does not mean the general expectation of death that all persons entertain. Its meaning, however, is not restricted to an apprehension that death is imminent. (Treas. Reg. § 20.2035-1(c)). Generally, both life and death motives are involved in these transfers, and the inquiry, therefore, becomes whether the "life" motives were the "dominant controlling or impelling" reasons for the transfer. Allen v. Trust Co. of Georgia, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367 (1946).
 
 
 61
 The transfer in this case was within the 3-year period; it was presumptively "in contemplation of death." The burden of going forward with the evidence to establish dominant life-motives is on the plaintiffs. Admittedly, when the property transferred is life insurance, there is some death-connected motivation because life insurance proceeds (and a group policy more particularly because it has neither cash surrender nor loan value) are payable only when the insured dies. Therefore, it may be more difficult for plaintiffs to show dominant life-motives.
 
 
 62
 Motivation is primarily a question of subjective intent. In this case, there are several objective facts which help to establish that decedent's dominant motives were life-oriented. The physical condition and age of the decedent at the time of the transfer are important "touchstones." Old age and bad health may conclusively establish that the primary motives were not life motives. See, e. g., McClure v. Burnet, 56 F.2d 548 (5th Cir. 1932), cert. denied, 287 U.S. 609, 53 S.Ct. 13, 77 L.Ed. 530. Old age, even extremely old age, however, may not be conclusive if accompanied by vigorous health. Under these circumstances, a transfer may not be in contemplation of death. See, e. g., Estate of Oliver Johnson, 10 T.C. 680 (1948); Wishard v. United States, 143 F.2d 704 (7th Cir. 1944).
 
 
 63
 Decedent is presented as a man in good health at the time of the transfer, without any prior history of illness. The parties have stipulated that at all relevant times he was considered to be in excellent health and periodically had been so advised by his physician. What we have, therefore, is the picture of a vigorous man, in good health, without any history of illness. Although the proof before us does not contain a direct statement of either a life or a death motive, on the basis of evidence which is largely circumstantial we conclude that plaintiffs have shown that life motives were the dominant reasons for the transfer.
 
 
 64
 If the primary motive for a transfer is to carry out a decedent's plan to distribute his property during his life-time, the transfer will not be considered in contemplation of death. Bell v. United States, 74 F.Supp. 295 (D.C.Minn.1947). Mr. Landorf had some 14 other policies of insurance on his life; all were owned by his wife or sons. He had designated his wife or sons as owners of the policies, and four of the policies had been assigned to his wife or sons. In addition, he had made several substantial gifts to his wife and sons during the years prior to his death (1959-1962). These facts indicate a practice of making gifts to his wife and sons during his lifetime and that the group policy transfer was part of the same life-motivated plan.
 
 
 65
 Defendant's argument is that the motive, if any, for having the insurance policies in his wife's or sons' names, is a death-motive because these transfers were part of a long-range plan to substitute life-transfers for a testamentary disposition. The government, however, challenges only this group-policy assignment as in contemplation of death. Defendant also argues that plaintiffs do not show the motive behind the gifts between 1959 and 1962. Defendant dismisses these gifts as insufficient to establish a pattern of gift-giving. We think that plaintiffs have established decedent's pattern of gift-giving and that the prior history of policy assignments and ownership indicates non-death motives for the challenged transfer. We do not accept defendant's position. It would require plaintiffs to show a specific and concise reason for the transfer other than decedent's desire to dispose of his property by giving gifts during his lifetime. There is no proof that this transfer was a substitute for a testamentary disposition.
 
 
 66
 There is one other life-oriented factor which we consider pertinent. Decedent's transfer, in part, helped his wife to establish her estate planning. The group policy had some immediate value to her. She could thereafter expect to receive the proceeds of the policy at her husband's death and could, therefore, plan her estate accordingly. The desire to aid a wife in her estate planning is an additional life-motive. Estate of Wilbur B. Ruthrauff, 9 T.C. 418 (1947).
 
 
 67
 Under these specific circumstances, we conclude that the dominant motives for making the transfer were life-motives and that the proceeds of the policy are not includible under section 2035.
 
 
 68
 Accordingly, plaintiffs are entitled to recover the amount set forth in their claim for refund, together with interest as provided by law. The amount of recovery is reserved for further proceedings under Rule 47(c).
 
 
 
 Notes:
 
 
 [1]
 Letters testamentary were issued to plaintiffs and Jacob Landau by the Surrogate's Court of the County of New York, State of New York, on January 28, 1963. Jacob Landau died on September 29, 1966
 
 
 [2]
 In addition to the stipulation of facts, the record contains depositions by Floyd Landorf and Howard Landorf, sons of the decedent, and by Lillian Landorf, his wife
 
 
 [3]
 During the period 1959-1962, decedent made the following gifts:
 1959 Howard Landorf $61,000 cash. 1960 Howard Landorf $7,500 cash. 1961 Lillian Landorf $12,256.65 life insurance premium payments. 1962 Howard Landorf $50,000 cash.
 
 
 [4]
 In essence, section 6532(a) (1) permits suit if a refund claim has been pending for at least six months without a decision thereon by the District Director
 
 
 [5]
 Cf. Commissioner of Internal Revenue v. Noel's Estate, 380 U.S. 678, 85 S.Ct. 1238, 14 L.Ed.2d 159 (1965); United States v. Rhode Island Hospital Trust Co., 355 F.2d 7 (1st Cir. 1966); Commissioner of Internal Revenue v. Treganowan, 183 F.2d 288 (2d Cir. 1950), cert. denied, sub nom., Estate of Strauss v. Commissioner of Internal Revenue, 340 U.S. 853, 71 S.Ct. 82, 95 L.Ed. 625; Estate of Goldstein v. United States, 122 F.Supp. 677, 129 Ct.Cl. 264 (1954), cert. denied, 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955).
 
 
 [6]
 See: S.Rep. No. 1631, 77th Cong., 2d Sess., p. 235, 1942-2 Cum.Bull., p. 677.
 
 
 [7]
 For example, McCarthy, Personal Life Insurance: Transfers of Ownership of Life Policies; Application of Federal Tax Liens to Life Insurance, 18 N.Y.U. Institute on Federal Taxation 435-447 (1960); Comments, Exclusion of Group Life Insurance Proceeds from Insured's Gross Estate for Estate Tax Purposes, 34 Fordham L.Rev. 269 (1965); Seely & Locke, Estate Planning with Employee Group Term Life Insurance, 52 A.B.A. Journal 485 (1966); Lewis, Revenue Ruling 68-334 and Assignment of Group-Term Life Insurance Policies, 47 Taxes 72 (1969)
 
 
 [8]
 Revenue Ruling 68-334 affirms the conclusion that, in appropriate circumstances, group life insurance policies may be assigned and excluded from the insured's estate. It provides, in part:
 "Advice has been requested whether the value of the amount received under a group term life insurance policy is includible in an employee's gross estate for Federal estate tax purposes under each of the situations discussed herein.
 * * * * *
 "In determining whether the decedent possessed an incident of ownership in the policy, consideration must be given to the effect of State or other applicable law. See section 20.2042-1(c) (5) of the regulations. The decedent's rights in the policy are generally determined by local insurance or property laws.
 * * * * *
 "The application of section 2042 of the Code to amounts received under group term life insurance policies is illustrated by three factual situations, as follows:
 * * * * *
 "Situation (2)
 "The decedent at the time of his death was insured for 50x dollars under a group term life insurance policy wholly paid for by his employer. As required by State law, the employee is granted under the terms of the policy the right to convert his group insurance into individual insurance upon termination of his employment. Both the policy and State law permit absolute assignment of the group insurance including the conversion privilege. The policy provides that coverage under the group policy shall cease upon termination of employment. The employee makes an irrevocable assignment of his insurance under the group policy, but retains the conversion privilege.
 "The value of the proceeds of the group term life insurance is includible in the gross estate of the insured. The decedent has effectively retained the power to control the disposition of the insurance through an exercise of the conversion privilege upon any termination of his employment and has thus retained an incident of ownership with respect to the policy. If either the group policy or local law prohibits an assignment of the conversion privilege, the same result follows notwithstanding any purported assignment of the conversion privilege.
 "Situation (3)
 "The facts are similar to those in Situation 2, in that both the group policy and the State law permit the employee to make an absolute assignment of all of his incidents of ownership in the policy. The policy provides that coverage thereunder shall cease upon termination of employment. Upon such termination of the insured's employment, the assignee acting alone could convert to a 50x dollar individual policy. The employee made an irrevocable assignment of all his incidents of ownership in the policy, including the conversion privilege. The insured could not have effected cancellation of the insurance coverage by terminating his employment. Consequently, the insured decedent did not die possessed of any incidents of ownership in the policy." [Emphasis added.]
 
 
 [9]
 See: Fearon v. Metropolitan Life Insurance Co., 138 Misc. 710, 246 N.Y.S. 701 (Mun.Ct.1930); Young v. General American Life Insurance Co., 35 Ohio L.Abs. 464, 41 N.E.2d 895 (Ohio App.1941); Howard v. Aetna Life Insurance Co., 329 Ill.App. 248, 67 N.E.2d 878 (1949); DeVille v. Continental Assurance Co., 10 A.D.2d 386, 199 N.Y.S.2d 876 (1960).
 
 
 [10]
 Defendant has not made any argument under section 2038
 
 
 [11]
 The validity of an assignment without consideration is established by statute in the State of New York, section 5-1107 of the General Obligations Law, McKinney's Consol.Laws, c. 24-A, formerly section 33(4) of the Personal Property Law, states:
 "an assignment hereafter made shall not be denied the effect of irrevocably transferring the assignor's right because of the absence of consideration, if such assignment is in writing and signed by the assignor, or by his agent."
 
 
 [12]
 "(a) GENERAL RULE — The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death
 "(b) APPLICATION OF GENERAL RULE — If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such transfer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death * * *."