ESTATE OF LAVERN D. SPRAGUE, DECEASED; HELEN J. SPRAGUE PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Sprague v. Commissioner
Docket No. 16847-79.
United States Tax Court
T.C. Memo 1982-301; 1982 Tax Ct. Memo LEXIS 445; 44 T.C.M. (CCH) 1; T.C.M. (RIA) 82301; June 1, 1982. J. Michael Traher, for the petitioner. David W. Otto, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined a deficiency of $ 6,999 in petitioner's Federal estate tax. The sole issue for decision is whether the decedent's assignment of a group *446 term life insurance policy on his life to his wife approximately 32 months prior to his death was made in contemplation of death within the meaning of section 2035. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Decedent, Lavern D. Sprague, died testate on January 5, 1976, at the age of 66. Decedent's wife, Helen J. Sprague (hereinafter sometimes referred to as Mrs. Sprague), was duly appointed the personal representative of his estate. Helen J. Sprague resided in Tucson, Arizona, at the time the petition was filed in this case. Decedent's Federal estate tax return was filed with the Internal Revenue Service Center, Ogden, Utah. During his adult life, decedent was a medical doctor, specializing in obstetrics and gynecology. By 1966, decedent became associated with a group of physicians forming the Tucson Clinic (hereinafter the Clinic), a facility providing medical services in Tucson, Arizona. Decedent remained associated with the Tucson Clinic until his death. In 1966, the Continental Assurance Company *447 (hereinafter Continental) issued a group term life insurance policy (hereinafter sometimes referred to as the Continental policy) covering participants of the Clinic. Decedent was a participant of the Clinic and Continental's policy provided him with $ 50,000 of term life insurance. At all relevant times herein, the Clinic paid the premiums on the Continental policy. The Continental policy, in addition to providing decedent with $ 50,000 of life insurance, contained a conversion privilege and a special disability benefit. The conversion privilege entitled decedent to convert his group policy into an individual policy of life insurance, "except term insurance," if, inter alia, his employment at the Clinic ceased. The special disability benefit consisted of two parts. First, if decedent became permanently and totally disabled prior to his 60th birthday and while insured under the Continental policy, Continental would pay decedent a fixed number of monthly installments uo to $ 50,000. Second, if decedent became disabled after attaining age 60 but prior to his 65th birthday, and while insured under the Continental policy, then subject to certain conditions, Continental would continue *448 to provide the decedent with term insurance coverage without requiring payment of premiums. In 1969, decedent and his wife sought the services of Security Planning Service, Inc. (hereinafter SPS), a Tempe, Arizona, company engaged in estate and financial planning services for clients. As a result of their consultations with representatives of SPS, including Donald J. Kenney (hereinafter Kenney), an attorney for Security, the following actions were taken by the Spragues during 1970: purchase of mortgages and gas and drilling investments; creation of a revocable living trust (hereinafter sometimes referred to as the revocable trust agreement); execution of last wills and testaments for decedent and his wife. On November 14, 1970, the Spragues executed the revocable trust agreement, and planned to transfer much of their community property to this trust in order to avoid probate and to save estate taxes. Decedent was the trustee of the revocable trust. In a letter that Kenney sent to decedent and his wife he stated, in pertinent part, that the Spragues' "estate plan" would achieve the following goals: A. First, by a Trust of this type [i.e., the revocable trust] we are able *449 to avoid the necessity of probate upon the death of the first spouse and the second spouse and the property will pass to the successor Trustee who upon the death of the second spouse will distribute it to your children pursuant to your request. By avoiding probate you are able to save approximately 10% of your estate upon the death of each spouse these costs which are saved include, court costs, attorneys fees, executor's commission which in Arizona approximate 10% of the probate estate. In addition by avoiding probate you avoid the necessity of having your property tied up for several months or even years, further, you avoid the necessity of having the Court approve any transfer or sale of property which would be necessary in the event a probate were necessary. B. Secondly, through a Trust of this type substantial estate tax savings will be realized upon the death of the second spouse. The reason for this is that the Trust retains the estate splitting benefits which you have upon the death of the first spouse under the community property laws of the State of Arizona. This means that upon the death of the first spouse due to community property only one-half of the estate is taxed *450 but if you do not have a Trust of this type the entire estate would be subject to taxation upon the death of the second spouse. Through this Trust the estate remains split and only one-half of the estate will be taxed upon the second spouse's death. In this regard one caution to be aware of is that these instruments are prepared with the assumption that the husband will die first which statistics show occur in probably 80% of the cases. In the event the wife should die first, you should contact your lawyer to make necessary revisions to maintain the estate tax savings qualities. C. Finally, and most important through Trust and Wills of this type we avoid possible family conflicts which might arise through various family members and dividing up the estate. A Trust of this type sets out in clear language the plans for disbursal of assets upon the death of the first spouse, upon the death of the second spouse so that no question or problems might develop later. Further we are assured through Trusts of this type that the surviving widow will be adequately taken care of. On April 29, 1971, the Spragues decided to terminate the services of SPS and Kenney because they were dissatisfied *451 with the length of time that it took Kenney to do their estate and financial planning. Prior to May of 1973, the Spragues sought the services of Executive Analysts, Inc. (hereinafter EAI), another estate and financial planning organization in Tucson, Arizona. With the assistance of EAI, D. Michael Romano (hereinafter Romano), an attorney experienced in estate tax matters, was retained by the Spragues for the purposes of amending their revocable trust and drafting new wills for them. [2]
Romano asked the Spragues several questions in order to obtain an idea as to what recommendations he should make with respect to their estate plan. In the course of his discussions with the Spragues, Romano learned that they did not have many liabilities. To Romano, the Spragues were "a fairly conservative couple who *452 did not live high on the hog," and Romano did not expect them to ever have a lot of expenses. Romano did specifically inquire about the decedent's health, but the decedent did not indicate that he had any health problems. In fact, decedent had been hospitalized as a patient for a medical illness or condition on the following occasions prior to 1973: (1) on February 25, 1960, decedent, then fifty years old, suffered a heart attack; and (2) on February 17, 1967, decedent sustained a skull fracture and brain laceration when he fainted during an operating room surgical procedure. On May 9, 1973, the Spragues amended their revocable trust pursuant to Romano's advice. Aside from making some minor changes and naming decedent's son, William E. Sprague, as the successor trustee in he event of decedent's death, incompetency, or resignation as trustee, the amendment amounted to a complete restatement of the Spragues' revocable trust agreement of November 14, 1970. In addition to amending their revocable trust on May 9, 1973, the Spragues each executed a last will and testament on such date. These wills revoked all prior wills executed by the Spragues, and they essentially provided for *453 the disposition of certain personal assets to the surviving spouse and children of the testator, the disposition of their residence to the surviving spouse, and the remainder of the respective estates to pour over into the November 14, 1970 revocable trust, as amended May 9, 1973. On May 11, 1973, pursuant to Romano's advice, decedent assigned to his wife all of his "right, title and interest in and to" the Continental policy. Decedent received no consideration whatsoever for making such assignment. The Continental policy, as a term life insurance policy, did not have a cash surrender value, and its value as of the date of its assignment to Mrs. Sprague was zero. No Federal gift tax return was filed by decedent in connection with the assignment of his interest in the Continental policy. As of May 11, 1973, decedent's wife had no separately owned property other than the interest in the Continental policy. She did, however, share with decedent an interest in their community property assets, which included real estate and mortgages on real estate, a note payable, a stock (equity) interest and profit sharing plan interest in the Clinic, and six life insurance policies, at least *454 three of which were on the life of decedent. In July or early August of 1973, decedent while on a camping trip with his wife, advised her that he had a pain in his groin and that he intended to see a physician about it. Decedent had been award of the pain for approximately six months prior to so informing his wife, and he was taking keflex, an antibiotic, because he believed that the pain was an infection. In August of 1973, decedent had Dr. P. J. Taylor (hereinafter Dr. Taylor), a physician, examine his groin. Dr. Taylor discovered a lump in decedent's left groin which was properly diagnosed as a histiocytic lymphoma, a cancerous condition. During August 6, 1973 through November 5, 1973, decedent received medical treatment for his cancerous condition, including radiation therapy. On January 5, 1976, decedent's cancer claimed his life. Decedent's father and many of his father's relatives had also died of cancer. None of the $ 50,000 of proceeds which were paid on the Continental policy were included on the Federal estate tax return filed by petitioner. In the notice of deficiency, respondent determined that the decedent's assignment of the Continental policy was a gift made *455 in contemplation of death, and that $ 25,000, the decedent's community property share of the proceeds from the Continental policy, should have been included in the decedent's gross estate under the provisions of section 2035. OPINION The sole issue for decision is whether the decedent's assignment of the Continental policy, a group term life insurance policy on his life, was made in contemplation of death, so that $ 25,000 of the proceeds paid on such policy are includable in his gross estate under section 2035. Since decedent's assignment of the Continental policy was made within 3 years of his death, section 2035(b) establishes a rebuttable presumption that such assignment was so made. [3]
*456 The purpose of section 2035 is to prevent the use of substitutes for testamentary dispositions designed to avoid estate taxes. United States v. Wells,283 U.S. 102, 117 (1931), Cleveland Trust Co. v. United States,421 F. 2d 475, 478 (6th Cir. 1970), cert. denied 400 U.S. 819 (1970). Since section 2035 establishes a rebuttable presumption that a transfer within 3 years of death was made in contemplation of death, the taxpayer opposing imposition of the estate tax must prove a negative, specifically, that the transfer in question was not made in contemplation of death. Estate of Compton v. Commissioner,532 F. 2d 1086, 1088 (6th Cir. 1976), affg. a Memorandum Opinion of this Court. Generally, this is a heavy burden for the taxpayer to meet, and where the property transferred is so inherently death oriented as a group term life insurance policy which has no cash surrender value, the taxpayer's burden is even heavier. American Fletcher Nat. Bank and Trust Co. v. United States,222 Ct. Cl. 117, 611 F. 2d 360, 364-365 (1979); *457 Estate of Compton v. Commissioner,supra at 1088; Berman v. United States,487 F. 2d 70, 72 (5th Cir. 1973). Nevertheless, the taxpayer will generally be found to have met his burden if the record shows that the decedent's dominant motive in making the transfer was not the thought of death but rather a purpose normally associated with life. Estateof Compton v. Commissioner,supra;Berman v. United States,supra.Whether the dominant motive in making the assignment was the thought of death or a purpose normally associated with life is a question of fact which turns on the facts and circumstances of each case. Allen v. Trust Co. of Georgia,326 U.S. 630, 636 (1946); Estate of Compton v. Commissioner,supra.
While petitioner concedes that an ancillary motive for the decedent's assignment of the Continental policy was to reduce the size of his taxable estate, petitioner argues that the dominant motive for such assignment was to accomplish life-related purposes. Petitioner *458 maintains that the conversion privilege and the special disability benefit provided by the Continental policy were "present interests" which Mrs. Sprague received as a result of the transfer of such policy. Petitioner also contends that the transfer was made to safeguard the insurance proceeds from decedent's creditors, and that the transfer was "pursuant to a plan" which the Spragues were establishing, with the assistance of Romano, to provide income for them after the decedent retired from work. Finally, petitioner argues that at the time of the transfer decedent was not aware that he had any life-threatening illness, and that decedent was not so old at such time as to be contemplating his death. Respondent, on the other hand, has advanced two alternative arguments in support of his position that the decedent's dominant motive for the assignment of the Continental policy was the thought of death. First, respondent maintains that the decedent was terminally ill at the time of the transfer and that the decedent suspected as much because of the clear history of cancer in his family. Second, respondent contends that the transfer was coincident with and part of the decedent's planning *459 for the distribution of his estate and the minimizing of estate taxes. Since we agree with respondent's second argument, we uphold his determination. Decedent's assignment of the Continental policy to his wife was made about the same time that both of them were revising their overall estate plans. On May 9, 1973, just two days prior to such assignment, the Spragues had executed new wills and had amended their revocable trust. Clearly, the decedent's execution of a will at such time indicates that he was focusing on the disposition of his assets upon his death. Moreover, the Spragues' May 9, 1973, amendment to their revocable trust further indicates that the decedent was giving thought as to the disposition of his property upon his death. It was this amendment in which a provision was made for the decedent's son, William E. Sprague, to serve as successor trustee in the event of the decedent's death. Furthermore, other than the successor trustee provision and some minor changes, the amendment was a complete restatement of the revocable trust, which clearly was drafted for death-oriented purposes. In Kenney's letter to the Spragues, set forth in pertinent part in the findings *460 of fact herein, he stated that the revocable trust would help to accomplish the following death-oriented goals: avoidance of probate on the death of the first spouse; substantial estate tax savings; and avoidance of family conflicts with respect to how the estate would be divided upon the death of the second spouse. Since the May 9, 1973, amendment to the revocable trust was in large part a restatement of the original version executed on November 14, 1970, we think that decedent was clearly contemplating death at about the time that he assigned the Continental policy to his wife. Against this factual background, petitioner wants us to believe that life purposes were the dominant motive for the decedent's assignment of the Continental policy of May 11, 1973, just two days after the execution of his latest will and the amendment to the revocable trust. Petitioner argues that the transfer of the Continental policy was life-motivated because it contained two "present interests," the conversion privilege and the special disability benefit. In the first place, the mere fact that a term life insurance *461 policy has a conversion privilege does not prevent a finding that the assignment of such policy was in contemplation of death. See American Fletcher Nat. Bank and Trust Co. v. United States,supra at 363. Moreover, petitioner claims, as it did during the trial of the instant case, that the decedent was not aware of any serious illness or condition at the time he transferred the Continental policy to his wife. Since we agree with such claim, we find it difficult to believe that the disability feature of the Continental policy could have been a dominant motive for the transfer. The record simply does not support petitioner's contention that the conversion privilege and the special disability benefit were the dominant motive for the transfer. No one testified that either the decedent or his wife considered these features of the Continental policy to be valuable. In fact, the record is not entirely clear as to whether the decedent and his wife were aware of either the conversion privilege or the special disability benefit at the time the transfer occurred. At trial, Mrs. Sprague testified that the only reason she could remember for transferring the Continental policy was *462 that Romano had recommended such action. At best, we view the conversion privilege and the disability feature of the Continental policy to have been incidental to the principal term insurance feature of that policy. Petitioner also argues that the transfer was made to safeguard the insurance proceeds from creditors, and that the transfer was made in pursuance of a plan to establish retirement income for the Spragues. Part of the basis for petitioner's argument is Romano's testimony that his reason for advising the transfer was so Mrs. Sprague would have the proceeds free from any of the decedent's creditors. Romano, however, also testified that the Spragues were "a fairly conservative couple who did not live high on the hog and I didn't expect that they would have potentially * * * [many] expenses * * *." Thus, Romano's testimony certainly does not persuade us that decedent was concerned about his creditors at the time of the assignment. Moreover, we note that decedent owned at least three other life insurance policies on his life at the time he assigned the Continental policy to his wife. If decedent was seeking to safeguard insurance proceeds from the claims of his creditors *463 why weren't these policies also transferred to his wife? While Mrs. Sprague may have been comforted by the thought of having the proceeds of the Continental policy free from decedent's creditors, we are unable to find convincing support in the record that this alleged purpose was the decedent's dominant motive for assigning such policy to his wife. We are equally unconvinced by petitioner's argument that the Continental policy was done "pursuant to a plan" to establish retirement income for the Spragues. Petitioner did not establish how the Continental policy fit into the Spragues' plan to provide retirement income. As a term policy, it had not cash surrender value and no fair market value at the time of the transfer. The policy would certainly not provide both of the Spragues with "retirement income" because the insurance proceeds were not payable until decedent's death. Thus any retirement income plan which the Spragues were considering for both of them could not have involved the Continental policy. The only way the Continental policy could conceivably fit into a retirement plan was by providing the financial assistance to Mrs. Sprague, assuming the decedent predeceased *464 her. Such a plan, however, would appear to be motivated by the decedent contemplating his own death and not life purposes. We recognize that if the Continental policy had been assigned as part of a pattern of gift giving to Mrs. Sprague then it might be argued that the assignment was part of a life motivated plan, the composition of which provided some immediate security. See Landorf v. United States,187 Ct. Cl. 99, 408 F. 2d 461, 473 (1969). Petitioner, however, has failed to establish a pattern of gifts to Mrs. Sprague which would bring the instant case within the rationale of Landorf. See also Estate of Wasserman v. Commissioner,T.C. Memo. 1982-271. Finally, petitioner argues that the transfer was not in contemplation of death because the decedent was unaware of any serious illness or condition at such time. While we agree that the decedent was certainly unaware that he had cancer on the date the Continental policy was assigned, the decedent need not be expecting imminent death in order for a transfer to be made in contemplation of death. *465 Berman v. United States,sura;Bel v.United States,452 F. 2d 683 (5th Cir. 1971), cert. denied 406 U.S. 919 (1972). See also Estate of McNamara v. Commissioner,T.C. Memo. 1981-674. Consequently, while we have taken into consideration the decedent's perception of his health at the time of the assignment, we think that the record, when considered as a whole, contains ample support that the dominant motives for the assignment were not life-oriented. Consequently, we uphold respondent's determination that the decedent's transfer of the Continental policy to his wife was made in contemplation of death. To reflect the foregoing, Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1976, unless otherwise indicated.↩
2. D. Michael Romano filed petitioner's petition in the instant case, and is a partner in he same law firm as J. Mitchael Traher, the petitioner's attorney of record in the instant proceeding. On January 19, 1981, the Court granted D. Michael Romano's motion to withdraw as counsel in the instant case because he planned to (and did in fact) testify at the trial of such case.↩
3. Sec. 2035 was amended by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1848, 1854 (sec. 2001(a)(5) and (d)(1)), effective for decedents dying after Dec. 31, 1976. Such section, as so amended, provides that all transfers by a decedent within 3 years of death are includable in the decedent's gross estate. However, such rule is not applicable to gifts with respect to which a gift tax return was not required to be filed, but such exception is not applicable to a transfer of a life insurance policy. Sec. 424 of the Economic Recovery Tax Act of 1981, Pub. L. 97-34, 95 Stat. 317, added sec. 2035(d) to the Code, effective for decedents dying after dec. 31, 1981. Such section provides that, generally, the value of gifts (other than gifts of life insurance) made by a decedent within 3 years of death will not be included in the gross estate of the decedent. See H. Rept. 97-201 (1981), 1981-38 I.R.B. 86-87. Thus, even as amended by the 1981 Act, for decedents dying after Dec. 31, 1976, sec. 2035↩ provides that a gift of a life insurance policy within 3 years of death is includable in a decedent's gross estate as a gift in contemplation of death.