ESTATE OF JOHN L. HUNTSMAN, DECEASED, ANTHONY REDMOND AND WACHOVIA BANK AND TRUST COMPANY, N.A., EXECUTORS, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8685-74.    Filed August 17, 1976.

*Leon L. Rice, Jr.,* and *R. Stephen Camp,* for the petitioner.
*Gary F. Walker,* for the respondent.

SIMPSON, *Judge:* In his notice of deficiency, the Commissioner determined a deficiency in the Federal estate tax of the Estate of John L. Huntsman in the amount of $97,991.40. In his second amendment to the answer, he determined such deficiency to be $107,470.13. The primary issue involves determining the fair market value of the decedent's stock in Asheville Steel Co. and Asheville Industrial Supply Co., including determining how certain life insurance proceeds payable to such corporations by reason of the death of the decedent, are to be taken into consideration. We must also decide whether the Commissioner properly raised a new issue in his second amendment to the answer.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

John L. Huntsman (the decedent) died testate, a resident of North Carolina, on February 5, 1971. His will was probated in Buncombe County, N.C. Anthony Redmond and Wachovia Bank & Trust Co., N.A., the executors, had their legal address in Asheville, N.C., at the time of filing the petition herein. A Federal estate tax return for the estate was filed with the District Director of Internal Revenue, Greensboro, N.C.

Asheville Steel Co. (Steel), which is located in Asheville, N.C., was chartered as a North Carolina corporation in 1944 and was originally named Asheville Steel & Salvage Co., Inc. (Salvage), but its name was changed to Steel on March 1, 1965. The decedent was originally one of the four equal shareholders in Steel, but by 1959, he had become its sole shareholder. From its creation, the decedent was the dominating force that operated the company.

Asheville Industrial Supply Co. (Supply) was originally organized as a division of Salvage in 1949. It was chartered as a North Carolina corporation on March 1, 1965, and pursuant to a plan of reorganization, it acquired all the assets and liabilities of Steel allocable to the Supply division. The decedent then acquired all the outstanding stock of Supply, and at the time of his death, he owned all the outstanding stock, 25,000 shares, of each of the corporations, Steel and Supply.

Asheville Machine & Foundry Co. (Machine & Foundry) was organized as a North Carolina corporation in 1950 by the decedent and three others, who each owned one-fourth of its stock. Beacon Manufacturing Co. (Beacon), one of the larger industries in the Asheville area, had requested the decedent to start this company as a workshop to service its textile machinery. Prior to October 1, 1970, the decedent's proportionate interest in the stock of Machine & Foundry had been increased to one-third, and Beacon had become the owner of the other two-thirds. On October 1, 1970, the decedent contributed his stock in Machine & Foundry to Steel, which purchased a portion of Beacon's stock in Machine & Foundry; the remainder of Beacon's stock in Machine & Foundry was redeemed. Machine & Foundry thereupon became a wholly owned subsidiary of Steel.

Steel was engaged in the business of fabricating and erecting structural steel for industrial and commercial buildings, with about 70 percent of its business consisting of fabrication and 30 percent consisting of erection and millwright work. To perform a typical job, steel, which had been received by rail, normally in 60-foot lengths, was cut to the desired length and brought into the shop. Using blueprints made in the drafting room, holes were punched in the steel and clip angles added to allow the steel beam to be attached to a column or another steel beam. Any other changes necessary to make the steel beam fit into the building to be constructed were also made. The steel beams were then cleaned, painted, and shipped to the construction site, where they were erected by the use of a mobile crane. The steel was then bolted together to make the skeletal framework of the building. Because of its limited crane capacity, Steel did not handle heavy jobs for large buildings or highway bridges; nor did it engage appreciably in operating a warehouse or service center for its customers.

Steel's customers were primarily general contractors in the construction business. At the time of the decedent's death, Steel's principal sales area was western North Carolina, extending to a radius of about 100 miles from Asheville. Although occasionally a project was secured outside this area, it was usually not feasible to do so because of the transportation costs involved. Approximately 70 percent of Steel's business was obtained by negotiations, rather than competitive bidding. The

margin of profit on a negotiated contract was much greater than on a bid contract. Prior to the decedent's death, he was the chief negotiator, and Steel did not have a sales force as such. Following his death, the bid work increased, and salesmen were used. Steel's principal competitor in Asheville was Dave Steel Co., although Dave usually handled the bigger and heavier jobs, while Steel handled the smaller ones. Outside the immediate Asheville area, it had competitors in Bristol, Tenn., Knoxville, Tenn., Hickory, N.C., and Greenville, S.C.

Steel's plant and office facilities were located on an 11-acre tract of land. The facilities included a main shop building, 120 feet by 300 feet; an office building, 54 feet by 90 feet; a warehouse, 100 feet by 70 feet; and a garage. It had about 50,000 square feet of production area. At the time of the decedent's death, the company had 67 production employees and 27 office employees. Among the larger pieces of production equipment were 6 overhead cranes in the shop having a capacity of 3 tons each. Some of the equipment was purchased used and was getting quite old, requiring considerable maintenance. Steel's production capacity was about 20 tons per week, or 1,000 tons per year.

Prior to the decedent's death, Steel began to modernize and renovate its equipment. In the fiscal year ending January 31, 1971, it purchased a 45-ton mobile crane for $105,000 and spent approximately $35,000 improving existing equipment. It borrowed $100,000 to purchase the crane. At a board of directors meeting shortly after the decedent's death, a preliminary schedule of capital needs, with estimated costs of $333,000, was presented for acquisition over a 5-year period. Of this amount, equipment costing about $262,000 had been purchased by November 1975, and other equipment costing over $280,000 had been purchased between February 1, 1971, and January 31, 1975. By November 1975, Steel's production capacity had been increased to almost 80 tons per week.

Supply was a wholesale business which sold supplies such as bolts, nuts, fasteners, tools, ladders, and paint to industrial and manufacturing plants. It did not deal in heavy equipment or high-priced items, and not more than 10 percent of its business related to the construction business. It had several competitors in the Asheville area. Its customers were located in generally the same area as Steel, but the two companies did not have the same customers and did not feed each other business. Before the

decedent's death, about 60 percent of Supply's business involved bidding or quoting prices. About 90 percent of the business was outside sales, and 10 percent was over-the-counter sales. It was not the exclusive agent for any of the products which it sold, and no single customer made up more than 10 percent of its sales. The decedent negotiated many of the sales to the industrial plants, and the company also employed four salesmen. Less than 10 percent of Supply's sales were to Steel, and such sales were strictly at arm's length.

Supply was located about 1 mile from Steel's plant on 1 acre of land. It had a building, 120 feet by 180 feet, and had about 25 employees at the time of the decedent's death.

Machine & Foundry operated a custom machine shop, doing small, miscellaneous job work, utilizing equipment such as lathes and grinders, but it did no foundry work. Its shop was a building, 100 feet by 200 feet, located on a 2-acre lot about 1 mile from Steel's plant. At the time of the decedent's death, it had about 20 employees. Its business was negotiated, and it had no sales force.

The decedent was the president and treasurer of Steel, Supply, and Machine & Foundry and was on the payroll of each corporation. He was closely identified by the public with these three corporations and was the one person that came to mind when one of the companies was mentioned. He was in complete control of all three corporations and made all decisions of any importance, keeping in close contact with each business. He negotiated practically all of the important contracts and sales of the companies up to the time of his death. During the fiscal year ended January 31, 1971, Steel obtained some unusually large one-time contracts involving sales of more than $500,000, which were negotiated in large part by the decedent.

The decedent worked 5 days per week, from 7 a.m. to at least 5 p.m. For many years, he took a vacation in Florida during January and February, which was a slack period for the companies. While in Florida, he was in daily contact with the companies and received sales and cash flow reports. He returned from Florida if he was needed in Asheville. The decedent always attended the meetings of the boards of directors. He had very good relations with the employees of the three companies and was friendly with them.

The decedent's general health up to the time of his death was very good. He died unexpectedly of a heart attack at the age of 62

while on vacation in Florida. His death gave rise to concern as to what was going to happen to the companies. The boards of directors and others connected with the corporations were apprehensive about the loss to the companies caused by the decedent's death. There was special concern about the loss of the decedent's ability to acquire negotiated business.

Steel and Supply owned several life insurance policies (or interests therein) issued on the life of the decedent. Upon the decedent's death, Steel received $250,371.03, and Supply received $153,174.81. Most of such insurance policies were "keyman" insurance policies while two were "split-dollar" policies. The parties have stipulated that the decedent had no interest in, ownership of, or control of such insurance policies (other than the split-dollar policies) except and to the extent, if any, he is considered to have had such interest, ownership, or control by virtue of his ownership of all the outstanding stock of Steel and Supply.

The keyman life insurance policies were acquired "to tide the company over in case that anything did happen" to the decedent. The last policy obtained was in the face amount of $200,000; $130,000 was payable to Steel, and $70,000 was payable to Supply. The board of directors of each company ratified the purchase of the policy at meetings on May 27, 1969. At such meetings, the decedent presented a letter to the boards which requested each company to redeem enough of his stock to pay his estate's administration costs and death taxes. The letters provided that the price to be paid for the stock so redeemed was to be 11 times the 5-year average earnings of each company. The board of directors of each company adopted a resolution agreeing to the request in the decedent's letters. Each resolution stated that the corporation would be bound to carry out the redemption when the corporation's executive vice president drafted and signed a reply to the decedent's letter. A copy of the corporation's acceptance was to be annexed to the corporate minutes, but there was no acceptance in the corporate records of either Steel or Supply.

Prior to the decedent's death, Steel and Supply paid the premiums on the keyman insurance in the proportions that the proceeds were payable to them. Neither corporation claimed an income tax deduction for such premiums. Prior to the decedent's death, the cash surrender value of each policy was carried as an

asset on the balance sheet of the corporation maintaining the policy, to the extent of its interest in the policy. Upon the death of the decedent, the difference between the cash surrender value of each policy and the amount of the proceeds of the policy was reflected as an extraordinary credit to income of the corporation for accounting purposes but was not reported as taxable income for income tax purposes.

Steel paid the annual premium on the two split-dollar policies to the extent of the increase in the cash surrender value of each policy and was the beneficiary of each policy to the extent of the cash surrender value at the decedent's death. The balance of the proceeds was paid to the decedent's estate, which reported them on its Federal estate tax return. The cash surrender values of these policies were carried as an asset on Steel's balance sheets.

Except for the policies on the life of the decedent, the only corporate life insurance owned by Steel from January 1, 1965, to October 29, 1975, were two policies totaling $31,000 on the lives of two former officers and one policy for $200,000 on the life of its executive vice president. Neither Supply nor Machine & Foundry maintained any such policies during this period. On January 31, 1971, the total cash surrender value of all the life insurance policies on the decedent's life owned by Steel and Supply was $95,903 and $42,127, respectively. The cash surrender value of Steel's policies included $15,080, which represented the cash surrender value of the two split-dollar policies.

On November 22, 1971, the boards of directors of Steel and Supply each agreed to redeem 7,300 shares of its stock held by the decedent's estate pursuant to section 303 of the Internal Revenue Code of 1954.[1] The redemption price was $18.4025 per share for the Steel stock and $5.5845 per share for the Supply stock. The resolution providing for each redemption included a provision to the effect that if it should be finally determined for Federal estate tax purposes that the value per share of the stock redeemed was different from the value reported for estate tax purposes, the number of shares to be redeemed should be adjusted to accord with such final determination of value, either by the payment of additional cash or by adjusting the number of shares redeemed, or a combination of both. As a result of the

---

[1] All statutory references are to the Internal Revenue Code of 1954 as in effect for the year in issue.

redemptions, the decedent's estate received payment of $134,338.25 from Steel and $40,766.85 from Supply.

Of the approximately $403,000 in insurance proceeds received by Steel and Supply, approximately $175,000 was used to redeem stock from the decedent's estate, $128,000 was taken into working capital, and $100,000 was held in reserve for possible additional redemptions from the decedent's estate. Of the amounts added to the working capital of Steel, $100,000 was paid toward the cost of capital additions made from February 1, 1971, to January 31, 1975.

Due to the close relationship between the general construction business and the steel fabrication industry, both businesses generally experience the same business cycles. Such industries do not operate on a constant basis, and their business cycles involve sharp rises and declines. Therefore, in order to evaluate a business in the steel fabrication industry, an investor should view the business over a 5- to 10-year period.

The net sales and the earnings per share (based upon 25,000 shares outstanding) of Steel and Supply were as follows:

| FYE | Steel [1] | | Supply | |
| | Sales | Earnings per share | Sales | Earnings per share |
| --- | --- | --- | --- | --- |
| 1/31/67 ____ | $1,533,517 | $4.12 | $1,284,660 | $.95 |
| 1/31/68 ____ | 1,641,280 | 3.60 | 1,310,101 | 1.28 |
| 1/31/69 ____ | 1,782,279 | 3.19 | 1,539,769 | 1.09 |
| 1/31/70 ____ | 1,870,121 | 1.13 | 1,633,690 | .29 |
| 1/31/71 ____ | 2,340,947 | 4.65 | 1,531,478 | 1.21 |
| 1/31/72 ____ | 2,302,979 | [2] 2.78 | 1,654,063 | [2] 2.33 |

[1] The table does not include the net sales and earnings of Machine & Foundry, which was acquired on Oct. 1, 1970.

[2] The extraordinary credit for the life insurance proceeds is not included.

Neither company paid a dividend for the fiscal years 1967 through 1971. Steel's earnings for the fiscal year 1971 were unusually high due to some extraordinary contracts acquired that year, the use of first-in-first-out inventory accounting during a period of substantially rising costs, and a change in inventory auditing procedures. The net result was to make the earnings for the fiscal year 1971 unusually high, while making the earnings for 1970 unusually low.

The book values per share of Steel and Supply were as follows:

| FYE | Steel | Supply |
|---|---|---|
| 1/31/67 _____ | $23.72 | $15.74 |
| 1/31/68 _____ | 27.33 | 17.02 |
| 1/31/69 _____ | 30.55 | 18.12 |
| 1/31/70 _____ | 31.04 | 17.72 |
| 1/31/71 _____ | [1] 39.06 | 18.93 |

[1] The book value of the assets of Machine & Foundry, acquired Oct. 1, 1970, is included.

If the life insurance proceeds received by the two companies were taken into account at the end of the fiscal year 1971, the book value per share of Steel and Supply would be $45.24 and $23.37, respectively. Steel's current assets less current liabilities would be $762,945, and it would have $562,043 cash on hand. Supply's current assets less current liabilities would be $492,967, and it would have $214,805 cash on hand.

The net sales and profits of Machine & Foundry were as follows:

| FYE | Net sales [1] | Profits |
|---|---|---|
| 6/30/67 _____ | $302,000 | Unknown |
| 6/30/68 _____ | 354,000 | Unknown |
| 6/30/69 _____ | 352,000 | Unknown |
| 6/30/70 _____ | 310,000 | Unknown |
| 1/31/71 [2] _____ | 162,137 | $11,182 |
| 1/31/72 _____ | 333,964 | 22,836 |
| 1/31/73 _____ | 382,087 | 34,758 |

[1] For the fiscal years 1967 through 1970, only the approximate sales are known.
[2] Machine & Foundry changed its fiscal year to correspond to that of its parent, Steel, when it was acquired on Oct. 1, 1970.

If Steel had acquired Machine & Foundry prior to February 1, 1969, its earnings per share would have been increased by 93 cents in fiscal 1970 and by 66 cents in fiscal 1971. Since Machine & Foundry was actually acquired on October 1, 1970, its earnings actually increased Steel's earnings per share by 26 cents for the fiscal year ending January 31, 1971.

On the Federal estate tax return for the Estate of John L. Hunstman, the decedent's stock in Steel and Supply was valued at $18.40 per share and $5.58 per share, respectively, at the date of the decedent's death. In his notice of deficiency, the Commissioner determined that the proceeds of the life insurance received by Steel and Supply were includable in the decedent's gross estate since the decedent possessed the incidents of ownership over the insurance policies at his death within the meaning of section 2042. He further determined that the fair

market value of the decedent's stock in Steel and Supply was $26.64 and $7.44 per share, respectively. In his amendment to the answer, filed prior to the trial of this case, the Commissioner specifically abandoned his position that the life insurance proceeds, payable to the corporations, were included in the decedent's gross estate. However, he alleged that the insurance proceeds must be considered in determining the value of the stock of the two corporations and that the fair market values of the Steel and Supply stock were $36.64 and $13.56 per share, respectively.

At the trial of this case, the petitioner and the Commissioner each presented expert testimony as to the fair market value of the stock. The petitioner's expert stated that in his opinion, on February 5, 1971, the fair market value of the Steel stock was $23.83 per share and the fair market value of the Supply stock was $8.50 per share. The Commissioner's expert stated that the fair market value of the Steel stock was $30 per share without the insurance proceeds and $40 per share with such proceeds. He also stated that the fair market value of the Supply stock was $6.60 without the insurance proceeds and $12.72 with such proceeds. At the close of the trial, the Commissioner's counsel orally advised the Court that he would move to amend the answer to conform the allegations concerning the value of the stock in the two corporations to the opinion of his expert. Thereafter, the Commissioner moved to file a second amendment to the answer, and such motion was granted. In his second amendment to the answer, the Commissioner alleged that the evidence at the trial showed that, although the life insurance proceeds were paid to the corporations in the first instance, most of them were eventually used for the benefit of the decedent's estate and therefore are includable as a separate asset in such estate under sections 2033 and 2042. In a reply to the second amendment to the answer, the petitioner stated that the Commissioner's new allegations were contrary to the stipulated facts and were not established during the trial of this case.

## OPINION

The first matter to be decided is whether the issue set forth in the Commissioner's second amendment to the answer is properly before us. Rule 41(b)(1) of the Tax Court Rules of Practice and Procedure provides:

(1) *Issues Tried by Consent:* When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. The Court, upon motion of any party at any time, may allow such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues; but failure to amend does not affect the result of the trial of these issues.

The Commissioner asserts that the issue set forth in his second amendment to the answer was tried with the consent of the petitioner. The petitioner, on the other hand, argues that in no way was such issue raised by the evidence admitted at the trial and that, in fact, it was unaware of the Commissioner's new theory until the second amendment to the answer was received, long after the trial of this case. We agree with the petitioner.

In his first amended answer and his counsel's opening statement at trial, the Commissioner unequivocally stated that the only issue in this case was the proper valuation of the stock owned by the decedent in Steel and Supply. Now, the Commissioner asserts that the petitioner was put on notice of the new issue by the cross-examination of one of its witnesses concerning the stock redemption, without objection from the petitioner. However, such testimony appeared to be offered merely to explain a corporate resolution which was included in the records of the corporations to which the parties had stipulated, and the admission of such testimony was not sufficient to indicate that the Commissioner was shifting his position or presenting the alternative position that the life insurance proceeds were in fact used for the benefit of the estate. Indeed, when at the close of the trial, the Commissioner's counsel orally requested leave to amend his answer to conform to the evidence, he did not, even then, express any intention to present such new position. The only reason given by him for the amendment to his answer was to reflect the higher valuations testified to by his expert.

Under these circumstances, we find that the position set forth in the Commissioner's second amendment to his answer was not raised by the evidence admitted at the trial and that such issue was not tried by the implied consent of the parties. *Edwin E. Markwardt,* 64 T.C. 989, 998 (1975). Moreover, at no time did the Commissioner put the petitioner on notice that he would argue that the insurance proceeds were paid for the benefit of the estate because the corporations redeemed some of the estate's stock, and since the Commissioner was fully aware of the

redemption and the surrounding facts prior to the trial, there is no excuse for his failure to timely raise the issue. In view of the fact that the petitioner was not given timely notice of such issue, it was deprived of any opportunity to present relevant evidence concerning such matter. *Daniel D. Palmer,* 62 T.C. 684, 698 (1974), affd. 523 F.2d 1308 (8th Cir. 1975). Accordingly, we hold that the issue as to whether the life insurance proceeds are includable in the estate of the decedent because some of them were used to redeem the stock held by him is not properly before us, and that the only issue raised by the pleadings is the fair market value of the decedent's stock in Steel and Supply. We express no views concerning the claim set forth in the Commissioner's second amendment to his answer.

The principal issue to be decided in valuing the stock of Steel and Supply is the effect of the life insurance proceeds received by them. The petitioner argues that such proceeds are simply another corporate asset which must be considered in valuing the stock. Whereas, the Commissioner argues that the value of the stock is ascertained by first finding the value of such stock without the life insurance proceeds and by then adding such proceeds to such value. The resolution of this issue turns upon the proper interpretation of two recently amended regulations: sections 20.2042-1(c) and 20.2031-2(f) of the Estate Tax Regulations.

The estate tax regulations concerning the treatment of corporate-owned life insurance, when the insured is the sole or controlling shareholder, have recently undergone substantial change. From 1943 until April 1974, the regulations provided that the sole shareholder of a corporation was considered to possess all of the incidents of ownership retained by the corporation in corporate-owned life insurance on his life. Sec. 20.2042-1(c)(2), Estate Tax Regs. (1958); sec. 81.27, Regs. 105 (1943). Thus, under such regulations, the sole shareholder's estate was required to include the full amount of any life insurance proceeds paid to the corporation, if the corporation had any incidents of ownership in the insurance policies. Sec. 2042(2). The regulations were apparently based upon an example contained in the legislative history of the predecessor of section 2042. See H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 491; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 677. The validity of such regulations has never

been specifically challenged. See *Cockrill v. O'Hara,* 302 F. Supp. 1365 (M.D. Tenn. 1969) (validity of regulations assumed); cf. *Landorf v. United States,* 408 F.2d 461, 471 (Ct. Cl. 1969) (in dicta, referred to the rule of the regulations); but see Osborn, "Corporate-Owned Life Insurance: Recent Developments in Estate Planning," 32d Ann. N.Y.U. Tax Inst. 293, 296-302 (1974).

In Rev. Rul. 71-463, 1971-2 C.B. 333, the IRS ruled that although section 20.2042-1(c)(2) of the Estate Tax Regulations expressly attributed the corporation's incidents of ownership only to a *sole* shareholder, it was also applicable to situations where the corporation owned life insurance on the life of a shareholder who had voting control of the corporation. This ruling was the subject of much criticism and was subsequently withdrawn, and it was announced that the regulations concerning corporate-owned life insurance were being reconsidered. Rev. Rul. 72-167, 1972-1 C.B. 307; see Walker, "What will effect of Proposed Regulations on corporate-owned life insurance be?", 39 J. Tax. 206 (1973).

· In April 1974, new regulations concerning the estate tax treatment of corporate-owned life insurance where the decedent was a shareholder were adopted. T.D. 7312, 1974-1 C.B. 277. Both parties agree that the new regulations govern this case.

The new regulations deleted the statement concerning a sole shareholder in section 20.2042-1(c)(2), Estate Tax Regs., and substituted a cross-reference to a new paragraph (c)(6) of such section, which provides in pertinent part:

(6) In the case of economic benefits of a life insurance policy on the decedent's life that are reserved to a corporation of which the decedent is the sole or controlling stockholder, the corporation's incidents of ownership will not be attributed to the decedent through his stock ownership to the extent the proceeds of the policy are payable to the corporation. * * * See § 20.2031-2(f) for a rule providing that the proceeds of certain life insurance policies shall be considered in determining the value of the decedent's stock. * * *

The Commissioner maintains the position that since the former regulations carried out the legislative purpose, and since those regulations had been approved by the courts, no change was intended in the treatment of life insurance proceeds when a sole shareholder is involved, and that therefore the life insurance proceeds should be added to the value of the stock otherwise determined under section 20.2031-2(f), Estate Tax Regs. He argues that the only effect of the change is to prorate

the life insurance proceeds over the shares of stock when the life insurance is on a controlling shareholder who does not own all the stock. However, his proposed interpretation of the new regulations is not supported by the language contained therein.

Prior to the adoption of the new regulations, the entire proceeds of corporate-owned life insurance were includable in the gross estate of the sole shareholder pursuant to section 2042 because the shareholder was considered to retain the incidents of ownership of the policy. However, the new regulations provide that the mere ownership of stock in a corporation is not sufficient to attribute the incidents of ownership of corporate-owned insurance policies to the sole or controlling shareholder, but such policies shall be *considered* in valuing the decedent's interest in the stock. Consequently, section 2042 does not apply to any of the life insurance proceeds received by the two corporations on account of the decedent's death.[2]

Section 20.2031-2(f), Estate Tax Regs., as amended by the new regulations, merely provides that in addition to the normal factors considered in determining the value of stock in a closely held corporation, life insurance policies payable to or for the benefit of the corporation shall be considered in the same manner as other nonoperating assets. The purpose of the rules contained in such section is to determine the fair market value of stock, which is defined as:

the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. * * * [Sec. 20.2031-1(b), Estate Tax Regs.]

In determining the price a willing buyer would pay, it is obvious that life insurance proceeds must be given "consideration," but it is equally obvious that the price paid by a willing buyer would not necessarily be increased by the amount of the life insurance proceeds. A buyer would take into consideration such proceeds in the same manner as he would consider other liquid assets of the

---

[2] Since the Commissioner did not timely raise the issue, we have not considered whether the use of the insurance proceeds by the two corporations to redeem some of the petitioner's stock pursuant to sec. 303 would result in the proceeds not being paid for the benefit of the corporations so that the incidents of ownership would be attributable to the decedent. See sec. 20.2042-1(c)(6), Estate Tax Regs. The Commissioner does not contend that the proceeds of the split-dollar insurance received by Steel are to be treated differently from the proceeds of the keyman insurance. See Rev. Rul. 76-274, 1976-29 I.R.B. 13.

corporation. If the corporation is operating a going business, the willing buyer will be influenced by the prospective earning power and dividend-earning capacity of the business, as well as its net worth, including any life insurance proceeds. See *Hamm v. Commissioner*, 325 F.2d 934, 941 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964); *Central Trust Co. v. United States*, 305 F.2d 393, 408 (Ct. Cl. 1962); see also Rev. Rul. 59-60, 1959-1 C.B. 237. Even if the value of the stock is based on the net worth of the corporation, such value may not be increased concomitantly by the amount of life insurance proceeds payable to the corporation. For example, if a corporation has liabilities of $100, and if its only asset consists of a life insurance policy providing for the payment of $75, a willing buyer would not pay $75 for the stock of such corporation. Thus, the treatment of the life insurance proceeds urged by the Commissioner is contrary to the regulations and contrary to well-established principles of valuation.

Moreover, section 20.2031-2(f), Estate Tax Regs., calls for life insurance proceeds to be treated in the same manner as other nonoperating assets of the corporation in determining the value of the stock, and our proposed treatment of the life insurance proceeds accomplishes that result. However, the interpretation urged by the Commissioner would treat the life insurance proceeds differently than other nonoperating assets. For example, at the time of the decedent's death, Steel had on hand over $300,000 of cash, some or all of which may be considered a nonoperating asset; yet, the Commissioner does not propose that such $300,000, or any part of it, be added to the value of the stock of Steel otherwise determined.

The Commissioner argues that our interpretation of section 20.2031-2(f), Estate Tax Regs., frustrates the clear intent of Congress to include corporate-owned life insurance in the estate of its sole shareholder. See H. Rept. No. 2333, 77th Cong., 1st Sess. (1942), 1942-2 C.B. 372, 491; S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 1942-2 C.B. 504, 677. However, the statements in the legislative history relied upon by the Commissioner indicate only that Congress believed that a sole shareholder was deemed to have the incidents of ownership possessed by his corporation on insurance policies on his life. The regulations now provide that the incidents of ownership held by a corporation are not to be attributed to its shareholder, and no indication is included in

the committee reports that Congress intended property owned by a decedent to be includable in his gross estate at other than its fair market value. Consequently, our interpretation of such section does not frustrate a congressional intent. In accordance with section 20.2031-2(f), Estate Tax Regs., we must determine the fair market value of the decedent's stock in the two corporations by applying the customary principles of valuation and by giving "consideration" to the insurance proceeds.

Where there is an ongoing business, such as Steel or Supply, and where there are no sales near the valuation date, neither the asset value nor the earning power is generally used as the sole criteria in determining stock value. See *Hamm v. Commissioner,* 325 F.2d at 941; *Portland Manufacturing Co.,* 56 T.C. 58, 80 (1971), affd. in an unreported case (9th Cir. 1975); *Trianon Hotel Co.,* 30 T.C. 156, 181 (1958). However, in the case of an operating business, primary consideration is given to earning power. *Levenson's Estate v. Commissioner,* 282 F.2d 581 (3d Cir. 1960), affg. on this issue a Memorandum Opinion of this Court; see Rev. Rul. 59-60, 1959-1 C.B. at 242.

The petitioner's expert witness was a bank vice president in charge of the bank's closely held business service, a valuation service offered to clients throughout the Southeast United States. In preparing his valuation of the stock of Steel and Supply, he interviewed the principal management of the companies, toured the production facilities, reviewed the books and records of the companies, and made a general review of the economic data of the industry. After acquiring such information, he consulted various financial publications in order to compare Steel and Supply with publicly traded companies in comparable businesses. The Commissioner's expert witness, a financial analyst for the Internal Revenue Service, used only information supplied by the IRS, did not interview the corporate officers, and made no independent investigation of the two companies. As a result, his valuation report contained several material factual errors.

The petitioner's expert determined that Steel was comparable to two publicly traded companies. Using the 5-year average earnings, he found that the price-earnings ratios of the two comparable companies were 6.1 and 5.9 at the date of the decedent's death. He also found that a much larger and more diversified company, partially engaged in the same business as

Steel, had a price-earnings ratio of 10.9 on the date of the decedent's death. He thus concluded that based on these comparables, a price-earnings ratio of 7 should be used in valuing Steel's stock. He also determined that there was no publicly traded company comparable to Supply. Based upon the general market conditions and his opinion that the business was somewhat risky, he concluded that a price-earnings ratio of 5 was appropriate for Supply.

The Commissioner's expert treated the two companies as if they were one business. Due to the factual errors in his report, he mistakenly found that Steel and Supply were comparable to businesses which were in fact significantly different. Furthermore, the Commissioner's expert used only a 3-year weighted average of earnings, even though at trial, he admitted that a 5-year average was preferable in this case. Consequently, we find that his determination of a price-earnings ratio of 10 for each company to be erroneous.

The Commissioner also relies upon the stock acquisition of Hickory Steel & Iron Co. (Hickory) by Carolina Steel Corp. (Carolina) in November 1968 to support his expert's determination. Hickory was also in the steel fabrication business but did not do steel erection work. He argues that the value of the Carolina stock exchanged for the Hickory stock indicates that the price-earnings ratio of the Hickory stock was in excess of 15. However, the evidence does not support the Commissioner's argument. The earnings which the Commissioner used to calculate his price-earnings ratio were but part of 1 year's earnings. Obviously, to be meaningful, a price-earnings ratio must be based upon an entire year's earnings. Furthermore, due to the cyclical nature of the steel fabrication business, even 1 year's earnings do not give a true indication of a corporation's earning potential. In addition, the petitioner's expert testified that there were substantial economic differences between the time of the acquisition of the Hickory stock in 1968 and the time of the decedent's death in 1971 which were not fully considered by the Commissioner's expert. Finally, there were apparently some restrictions on the marketability of the Carolina stock received in exchange for the Hickory stock that may have reduced its value. Consequently, when the necessary adjustments are made to reflect these differences, the price paid for the Hickory stock

does not support the determination of the Commissioner's expert.

In valuing the stock of the two companies based upon earnings, the petitioner's expert determined the 5-year average earnings and multiplied that amount times the appropriate price-earnings ratio. We believe that the price-earnings ratios used by him were generally reasonable, but in computing the earnings of Steel, he neglected to account for the acquisition of Machine & Foundry in 1970. To reflect the amount a purchaser would have paid for the Steel stock, the average earnings of Machine & Foundry must be taken into account. Although there is only evidence of Machine & Foundry's earnings for 2 of the 5 years prior to the decedent's death, the petitioner's expert should have made an adjustment to the 5-year average earnings of Steel to reflect the average earnings of Machine & Foundry over such period. Using our best judgment, we find that based solely upon earnings, the value of the stock in Steel and Supply at the date of the decedent's death was $29 and $5 per share, respectively.

The petitioner's expert determined that valuing the stock of the two corporations solely on their earnings would be unwarranted in view of the high book value [3] of the stocks. In valuing the Steel stock, he applied a formula giving four times as much weight to the earnings value as the net asset value. In the case of the Supply stock, he gave the earnings value three times the weight of the net asset value. While we agree generally with the approach of the petitioner's expert, we find that he did not give sufficient weight to the strong cash position of the two corporations, due in part to the insurance proceeds. It is true that Steel needed capital for the major purchases it was planning, but we are convinced that a potential purchaser of the stock of each company would give greater consideration to the net asset value of the corporations than did the petitioner's expert. Using our best judgment, we find that the value of the stock in Steel and Supply, on the date of the decedent's death, based upon both their earnings and net asset values, giving consideration to the insurance proceeds received by each, was $33 and $11 per share, respectively.

One final adjustment is necessary to determine the actual price a willing buyer would pay for the stock of these two companies.

---

[3] Both experts used book value rather than net asset value. Since neither party has raised the issue, we will treat the book value as if it were the net asset value.

The decedent was the dominant force in both businesses, and his untimely death obviously reduced the value of the stock in the two corporations. However, both corporations had competent officers who were able to assume successfully the decedent's duties. Both experts agreed that some discount must be made to reflect the loss of the decedent. Using our best judgment, we find that after discounting the value of the stock to reflect the loss of the decedent, the fair market value of the Steel and Supply stock at the date of the decedent's death was $29 and $10 per share, respectively.

*Decision will be entered under Rule 155.*

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.