ESTATE OF RUBEN RODRIGUEZ, DECEASED, ZOILA P. RODRIGUEZ PERSON IN POSSESSION AND ADMINISTRATRIX, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Estate of Rodriguez v. Commissioner
Docket Nos. 46423-86, 48430-86, 20276-87.
United States Tax Court
T.C. Memo 1989-13; 1989 Tax Ct. Memo LEXIS 13; 56 T.C.M. (CCH) 1033; T.C.M. (RIA) 89013; January 10, 1989. William E. Frantz and Donald B. DeLoach, for the petitioners. John B. Grattan, for the petitioners in docket Nos. 48430-86 and 20276-87 only. Julie M. T. Foster, for the respondent. WILLIAMS
MEMORANDUM FINDINGS OF FACT AND OPINION WILLIAMS, Judge: In these consolidated cases the Commissioner determined a deficiency of $ 215,208 in Federal estate tax due from the estate of Ruben Rodriguez. The Commissioner also determined a deficiency in petitioners' Federal income tax of $ 128,903.67 for the taxable year 1982 and an addition to tax of $ 12,890.37 pursuant to section 6661. [2] The Commissioner further determined a deficiency in petitioner Zoila Rodriguez' Federal income tax of $ 137,873.69 for the taxable year 1983 and an addition to tax of $ 34,468.42 pursuant to section 6661. These cases were consolidated for purposes of trial, briefing and opinion. The estate tax deficiency is attributable *15 in part to respondent's determination that the value of a building used by decedent's corporation is includable in decedent's estate. The Federal income tax deficiencies arise out of the same determination, viz, that decedent rather than the corporation owned the building. The issues we must decide are: (1) whether the property used as the principal place of business of decedent's corporation is includable in decedent's gross estate pursuant to section 2033; because of our resolution of this issue, we do not reach the question of the value of that property, (2) whether certain mortgage payments are includable in petitioners' income as constructive dividends, (3) whether petitioners are liable for additions to tax pursuant to 6661, (4) the value for Federal estate tax purposes of decedent's stock in his corporation, and (5) whether the entire value of a certificate of deposit decedent owned jointly with his wife and his wife's mother is includable in decedent's gross estate pursuant to section 2040. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Ruben Rodriguez ("decedent") died intestate on June 7, 1982, survived by his wife, Zoila Rodriguez ("petitioner"), *16 two minor children of their marriage and four adult children from previous marriages. Decedent resided in Atlanta, Georgia at his death. The administratrix, Zoila Rodriguez, timely filed the estate tax return. On the date that each petition was filed, Zoila Rodriguez, as an individual and as administratrix, resided in Atlanta, Georgia. Decedent purchased an existing company, Maria Tortilla, Inc., in 1970 and renamed it Los Amigos Tortilla Manufacturing ("Los Amigos"). Los Amigos is a corn and flour tortilla manufacturing business providing "shells" used by Mexican styled restaurants for tacos, burritos, etc. Decedent and petitioner incorporated Los Amigos on August 11, 1972. Los Amigos was a closely held corporation from the date of its incorporation until decedent's death. Its securities were not registered with the Securities and Exchange Commission and were not regularly traded in any market. Decedent was President of Los Amigos until his death, and petitioner was Secretary/Treasurer. On the date of decedent's death, Los Amigos' outstanding stock consisted of 10,000 shares of common stock, 7,000 s7000 (70 percent) of which was owned by decedent and 3,000 (30 percent) *17 of which was owned by petitioner. Decedent's estate tax return reported the fair market value of decedent's 7,000 shares of common stock in Los Amigos as $ 500,000 or $ 71.42 per share. In his statutory notice, respondent determined that the fair market value of decedent's stock at the date of his death was $ 823,000. Prior to his death, decedent had been in the tortilla manufacturing business for approximately thirty years. From 1972, the year Los Amigos was incorporated, until his death in 1982, decedent was in charge of the entire operation of Los Amigos. His duties included overseeing purchasing, manufacturing, sales, distribution, personnel matters, quality control and equipment maintenance. He worked at least two shifts and was at the Los Amigos plant during most of its operating hours. Petitioner also worked at Los Amigos, but her duties involved only in-house bookkeeping. On September 28, 1976, the decedent purchased property located at 251 Armour Drive, N.E., Atlanta, Georgia ("Armour Drive property") which consisted of 1.865 acres improved with a building used as an office and warehouse. Decedent purchased the Armour Drive property for Los Amigos' operations, and *18 it has been Los Amigos' principal place of business since 1976. The Armour Drive property was purchased for a cost of $ 275,000. The closing statement reflects that the decedent purchased the property in his own name and paid $ 50,000 as a down payment, plus closing costs. On September 28, 1976, the decedent executed a Deed to Secure Debt to the seller in the amount of $ 225,000 and received a Warranty Deed from the seller. The decedent was solely and personally liable on the purchase money note and security deed for the purchase balance. No corporate resolution specifically authorized either the corporation to purchase the Armour Drive property or the decedent to acquire the property for the corporation. Decedent had no expertise in real estate matters at the time he purchased the Armour Drive property. The sellers of the Armour Drive property refused to sell the property to Los Amigos because they considered the corporation too much of a credit risk. Instead, they required decedent's personal liability. The sale, therefore, was closed in decedent's name. Pursuant to decedent's instructions, Los Amigos' certified public accountant placed the Armour Drive property on the *19 corporation's books as a corporate asset. The accountant listed the down payment decedent had made on the property as a liability owed to decedent. The accountant also designated the remaining indebtedness owed on the mortgage secured by the Armour Drive property as a liability owed to the sellers on the corporate books. Los Amigos subsequently paid the liability owed decedent for the down payment. The Armour Drive property was titled in the decedent's name from the date of purchase throughout his lifetime and at the date of his death. Decedent and Los Amigos consistently treated the Armour Drive property as a corporate asset. Los Amigos treated the Armour Drive property as a corporate asset on its books and records from 1976 until the time of the trial. From January 1977 through December 1986, Los Amigos made all monthly mortgage payments for the Armour Drive property. The January 1977 mortgage payment was in the amount of $ 2,881.99; February 1977 through December 1986 mortgage payments were in the amount of $ 1,881.99 (principal and interest). During the years 1976 through 1986, Los Amigos deducted depreciation and interest paid on the mortgage note for the Armour Drive property *20 on its corporate income tax returns. Los Amigos paid and deducted the property taxes on the Armour Drive property on its corporate income tax returns from 1977 through 1986. During the years 1976 through 1986, Los Amigos paid all the insurance premiums related to the Armour Drive property. Los Amigos also made and paid for all of the improvements to the building located on the Armour Drive property during the relevant years. From the purchase of the property in 1976 through decedent's death in 1982, there was no lease agreement between the decedent and Los Amigos for the Armour Drive property. Los Amigos did not pay rent and claimed no deduction for rent for these years. Subsequent to decedent's death through 1986, there was no lease agreement between petitioner and Los Amigos for the Armour Drive property. Los Amigos did not pay any rent and claimed no deduction for rent for these years. Decedent did not claim deductions for depreciation, property tax or interest with respect to the Armour Drive property on his 1976 through 1982 joint Federal income tax returns. Petitioner did not report the Armour Drive property as property owned by decedent at the date of death on decedent's *21 estate tax return. On July 26, 1982, petitioner's attorney, S. Andrew Shuping, Jr., filed an Application for Twelve Month's Support with the Fulton County Probate Court on behalf of petitioner. Shuping also was attorney for Los Amigos and knew for two or three years prior to decedent's death that the Armour Drive property was titled in decedent's name. On September 7, 1982, the Fulton County Probate Court entered a Final Order granting the Application for Twelve Month's Support. The Order included the Armour Drive property. On September 9, 1982, attorney Shuping recorded the Certificate of Order of Year's Support. Los Amigos' income before taxes for the years 1978 through 1986 was as follows: Year
Income (loss)
1978
$  82,045 1979
108,456 1980
249,677 1981
239,619 1982
378,315 1983
87,378 1984
(182,848)
1985
(522,536)
1986
171,439 At the date of decedent's death, Los Amigos was the owner and beneficiary of a life insurance policy (face amount $ 250,000) on the life of the decedent. One-half of the life insurance was payable to creditors on a machinery debt at his death. After decedent's death, petitioner became president *22 of Los Amigos. During the period immediately after decedent's death, petitioner received numerous inquiries from customers, suppliers and others about whether Los Amigos would continue to offer the same quality product, service and price that it had offered during decedent's management of the company. Los Amigos suffered a decline in business after decedent's death. Los Amigos lost the flour tortilla account of Del Taco Mexican Cafes after decedent's death because the flour tortillas were breaking and cracking. Del Taco Mexican Cafes was one of Los Amigos' principal customers during 1981 and 1982 for corn and flour tortillas and the largest account that was lost. Although Del Taco gave Los Amigos the opportunity to correct the flour tortilla problem, Los Amigos was unable to perform to acceptable standards under petitioner's management. Los Amigos' failure to perform was a consequence of decedent's death. Del Taco then gave the account to another company, and paid thirty percent more for the product previously produced by Los Amigos prior to decedent's death. At decedent's death, he jointly owned a certificate of deposit. C&S National Bank issued Certificate of Deposit No. *23 S 0854399 in the face amount of $ 50,000 to decedent, petitioner, and Rosa Perez who is petitioner's mother. OPINION The first issue we must decide is whether the Armour Drive property is includable in decedent's gross estate. Decedent purchased the property in his name in 1976 after the sellers refused to sell it to Los Amigos. Thereafter, Los Amigos used the property in its business, consistently treating the property as a corporate asset. At his death, decedent still held legal title to the property. Petitioners contend that the beneficial ownership of the property was owned by Los Amigos on the date of decedent's death. Petitioners argue that decedent purchased the Armour Drive property only because the sellers would not sell to Los Amigos and that decedent merely held bare, legal title to the property as the trustee of an implied resulting trust in favor of Los Amigos. Respondent argues that decedent owned the Armour Drive property legally and beneficially and the property, therefore, is includable in decedent's gross estate pursuant to section 2033. Section 2033 provides that the value of the gross estate includes the value of all property to the extent of the decedent's *24 interest at the time of his death. The regulations pursuant to section 2033 also provide that the "gross estate includes property beneficially owned by the decedent at the time of his death." Sec. 20.2033-1(a), Estate Tax Regs. Georgia law applies to determine what interest decedent had in the property on the date of his death. Commissioner v. Estate of Bosch,387 U.S. 456 (1967). The pertinent Georgia statute provides as follows: Trusts are either express or implied. Express trusts are those trusts created and manifested by agreement of the parties. Implied trusts are those trusts which are inferred by law from the nature of the transaction or the conduct of the parties. Ga. Code Ann. sec. 53-12-22 (1982). The statute further describes the circumstances that give rise to an implied trust: A trust is implied: (1) Whenever the legal title is in one person but the beneficial interest, either from the payment of the purchase money or from other circumstances, is either wholly or partially in another; (2) Where, from any fraud, one person obtains the title to property which rightly belongs to another; (3) Where, from the nature *25 of the transaction, it is manifest that it was the intention of the parties that the person taking the legal title should have no beneficial interest; or (4) Where a trust is expressly created but uses either are not declared, are ineffectually declared, extend only to a part of the estate, or fail from any cause, in which case a resulting trust is implied for the benefit of the grantor or testator or his heirs. Ga. Code Ann. sec. 53-12-26 (1982). Because this case does not involve fraud or an express trust, only the first and third statutory classifications are relevant. Generally, trusts arising under the first and third categories in the statute are resulting trusts. Hancock v. Hancock,205 Ga. 684, 54 S.E.2d 385, 389 (1949). An implied resulting trust arises because of the mutual intention of the parties to create the trust. Hall v. Higgison,222 Ga. 373, 149 S.E.2d 808, 810 (1966); see Estate of Spruill v. Commissioner,88 T.C. 1197, 1222-1224 (1987). After reviewing the statute and Georgia case law thereunder, the Georgia Supreme Court stated in 1982: circumstances may be offered as evidence *26 of an intention (whether or not expressly articulated by each party) that title shall vest in one and beneficial ownership in the other. The scope of such evidence includes all of the facts and circumstances surrounding the transaction. The ultimate inquiry is whether there was, in truth, a mutual understanding, not whether such an understanding was expressed in plain and unambiguous terms. [Emphasis in original.] Harrell v. Harrell,249 Ga. 170, 290 S.E.2d 906, 907 (1982). Decedent paid the down payment and personally signed the note for the Armour Drive property because the sellers required his personal liability. Pursuant to decedent's instructions, Los Amigos entered the property on its books as a corporate asset. The corporation repaid decedent for the down payment on the property and made all mortgage payments. In addition, Los Amigos paid all insurance premiums, property taxes and building improvement costs on the property. Los Amigos also deducted depreciation, interest paid on the mortgage note and property tax on its corporate income tax returns. Decedent did not claim deductions for depreciation, interest or property tax on his Federal *27 income tax returns with respect to the Armour Drive property. Decedent did not lease the property to Los Amigos, and Los Amigos did not claim any deductions for rent on its corporate income tax returns. In short, Los Amigos and decedent consistently treated the Armour Drive property as a corporate asset throughout the years at issue. Holding title as petitioner did is, moreover, a common practice to secure the liability of the beneficial owner. Under the facts and circumstances of this case, we find that decedent and Los Amigos mutually understood that while legal title would remain in decedent, beneficial ownership would vest in Los Amigos. In Estate of Spruill v. Commissioner,88 T.C. 1197 (1987), a case decided under Georgia law, decedent held legal title at his death to the homesite of his daughter and her husband. Decedent had constructed their homesite and conveyed it to them for $ 20,000. The daughter and her husband were unable to obtain a loan for the purchase price; they conveyed the property back to the decedent who borrowed $ 20,000 and used the property as security to obtain the loan. Decedent's daughter and her husband paid decedent until decedent *28 told them no more payments were necessary. The daughter asked decedent to deed her the property, but decedent told her he would take care of it in his will. We found that decedent and his daughter mutually understood at the time the daughter conveyed the property back to decedent that she was to retain beneficial ownership of the homesite. 88 T.C. at 1215. Similarly, in the present case, decedent purchased the Armour Drive property solely for use in Los Amigos' business. Decedent did not exercise control over the property except through his authority as a corporate officer; Los Amigos used and controlled the property as a corporate asset. Decedent had legal title as security for Los Amigos' debt to him for the purchase price. Pursuant to decedent's instructions, Los Amigos' accountant reported the Armour Drive property as beneficially owned by Los Amigos for both book and tax purposes. We find a mutual understanding between decedent and Los Amigos at the time decedent purchased the property that decedent was to have bare legal title and Los Amigos was to have beneficial ownership of the Armour Drive property. The evidence in this case supports the finding of a *29 resulting trust under Georgia law. Respondent argues that petitioner took an inconsistent position with respect to the ownership of the property in the probate court. There petitioner asserted that the decedent owned the Armour Drive property in order to set aside the property for her year's support. Petitioner's position here, however, is not inconsistent: the Georgia state probate court determines the passage of legal title at death; petitioner, therefore, properly listed all property to which decedent held legal title in the probate court proceeding. Beneficial ownership, not legal title, governs the Federal estate tax consequences here. Inclusion of the asset in the probate court and exclusion from the gross estate for Federal estate tax purposes are entirely consistent in this case. Respondent also contends that under Georgia law, petitioners must show the existence of a resulting trust by clear and convincing evidence. We do not find it necessary to decide this issue. Petitioners have provided sufficient evidence of a resulting trust whether the standard is by the preponderance of the evidence or by clear and convincing evidence. Estate of Spruill v. Commissioner,88 T.C. at 1218 n.18. *30 We conclude that decedent held the property in an implied resulting trust for the benefit of Los Amigos. The property, therefore, is not includable in decedent's gross estate. Because of our holding, petitioner need not include in her income any part of the mortgage payments made by Los Amigos. These were not constructive dividends. Furthermore, petitioners are not liable for the additions to tax pursuant to section 6661 which respondent determined because of petitioners' failure to report as constructive income Los Amigos' mortgage payments. Petitioners properly reported their transactions with Los Amigos, and the property was properly excluded from decedent's gross estate. It was an asset owned by Los Amigos and not by decedent. We next must determine the fair market value of decedent's stock in Los Amigos at decedent's death. Decedent owned 70 percent of the Los Amigos stock at the time of his death. Petitioners' expert witness, who assumed Los Amigos owned the Armour Drive property, appraised the fair market value of the stock at trial at $ 332,700. Respondent's expert witness, who assumed that decedent owned the Armour Drive property, valued the stock at $ 823,000. *31 Property includable in the gross estate must be valued. Sec. 2031(a). Value is generally the fair market value at the time of decedent's death. Sec. 20.2031-1(b), Estate Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 20.2031-1(b), Estate Tax Regs.; Estate of Hecksher v. Commissioner,63 T.C. 485, 490 (1975). Subsequent events are relevant to determining the fair market value at the date of death if the events were reasonably foreseeable at the valuation date. Ithaca Trust Co. v. United States,279 U.S. 151, 155 (1929); Estate of Gilford v. Commissioner,88 T.C. 38, 52 (1987). Valuation of closely held stock for tax purposes is imprecise; each case turns on its own particular facts. Hamm v. Commissioner,325 F.2d 934, 938 (8th Cir. 1963), affg. a Memorandum Opinion of this Court, cert. denied 377 U.S. 993 (1964); Messing v. Commissioner,48 T.C. 502, 512 (1967). Valuation is "necessarily *32 an approximation arrived at by the trial court" after considering all the relevant factors. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), affg. on the valuation issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958). Valuation of closely held stock is a "question of judgment rather than mathematics." Hamm v. Commissioner, supra at 940. Petitioners and respondent each presented one expert witness at trial who valued decedent's 70 percent interest in Los Amigos. Petitioners' expert witness, Glen A. Hultquist, concluded the stock was worth $ 332,700. [3] Respondent's expert witness, Philip J. Schneider, appraised the stock at $ 823,000. Both experts considered the following factors from Revenue Ruling 59-60, 1959-1 C.B. 237, 238, in determining the fair market value of Los Amigos: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. *33 (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. Expert witnesses' opinions are supposed to aid the court in understanding an area requiring specialized training, knowledge or judgment. As the trier of fact, we are not, however, bound by the experts' opinions. Silverman v. Commissioner,538 F.2d 927, 933 (2d Cir. 1976), affg. a Memorandum Opinion of this Court; Chiu v. Commissioner,84 T.C. 722, 734 (1985). One expert may be persuasive on one particular element of valuation while another expert may provide more incisive help on some other element of valuation. Parker v. Commissioner,86 T.C. 547, 562 (1986); Estate of Gallo v. Commissioner,T.C. Memo. 1985-363. Consequently, using our best judgment, we may adopt some portions and reject other portions of expert testimony. Helvering v. National Grocery Co.,304 U.S. 282 (1938). In valuing the Los Amigos stock for trial, Hultquist combined an income and a book value *34 approach. Under the income approach, Hultquist adjusted pre-tax income to account for the loss of the decedent, the key man in the business. The earnings as adjusted were $ 210,000. He capitalized the adjusted earnings using a 30 percent capitalization rate. [4]Hultquist next determined the book value of Los Amigos. He used the book value method because thirteen companies he examined in the food industry were sold at a percentage of book value. He adjusted the book value based on one of the thirteen sales, the only company he found truly comparable, at 80 percent of book value. Hultquist used a weighted average of the resulting amounts from the income and book value approaches, 40 percent for the income approach and 60 percent for the book value approach. Hultquist discounted the weighted average by 35 percent for lack of marketability. Seventy percent of the result was the value of decedent's 70 percent stock interest, $ 332,700. *35 Respondent's expert witness, Schneider, used only an income approach. Schneider first adjusted Los Amigos' income as if decedent owned the Armour Drive property rather than Los Amigos. He then used a 28.46 percent capitalization rate to determine the value of the corporation. Schneider noted that although normally he would adjust the capitalization rate to account for the loss of a key man, he did not adjust the rate here because of the $ 250,000 life insurance policy on decedent. Also, he testified that decedent's salary would pay for a replacement. Seventy percent of the corporation's value, $ 823,000, was the value respondent used in his deficiency notice. Both experts used a capitalization of earnings method in determining their appraised value of Los Amigos. We accept as appropriate the use of the capitalization of earnings method. See Central Trust Co. v. United States,305 F.2d 393, 404 (Ct. Cl. 1962); Estate of Huntsman v. Commissioner,66 T.C. 861, 876 (1976). We reject, however, Hultquist's adjustment to value based on a percentage of book value. The businesses that were sold at a percentage of book value, as petitioners' expert *36 found, were not comparable with one exception. We find that petitioners have not shown that using the book value method to adjust the value determined by the capitalized earnings method is appropriate in this case. We agree with respondent's expert that the appropriate valuation approach to use in this case is the capitalization of earnings unadjusted by book value. We also believe the capitalization rate of 28.46 percent used by respondent's expert was appropriate. Nevertheless, we do not agree with respondent's expert that no adjustment for the loss of a key man is necessary in this case. Respondent argues that an adjustment is inappropriate because Los Amigos maintained $ 250,000 of insurance on decedent's life. Also, respondent's expert witness testified that he did not make any allowance for the value of decedent as a key man because his replacement cost was equal to his salary. These arguments understate the importance of decedent to Los Amigos and the adverse effect his death had on business. We agree with petitioners that an adjustment is necessary to account for the loss of decedent. The evidence shows that decedent was the dominant force behind Los Amigos. He worked *37 long hours supervising every aspect of the business. At the time of his death, Los Amigos' customers and suppliers were genuinely and understandably concerned about the future of the business without decedent. In fact, Los Amigos soon lost one of its largest accounts due to an inability to maintain quality. The failure was due to decedent's absence from operations. Profits fell dramatically without decedent to run the business. No one was trained to take decedent's place. Capitalizing earnings is a sound valuation method requiring no adjustment only in a case where the earning power of the business can reasonably be projected to continue as in the past. Where, as in this case, a traumatic event shakes the business so that its earning power is demonstrably diminished, earnings should properly be adjusted. See Central Trust Co. v. United States,305 F.2d at 403. An adjustment to earnings before capitalizing them to determine the company's value rather than a discount at the end of the computation is appropriate to reflect the diminished earnings capacity of the business. We adopt petitioners' expert's adjustment to earnings for the loss of the key man. The *38 final adjustment to value remaining in issue is a discount for lack of marketability. Respondent contends that any discount for lack of marketability is offset by a control premium for decedent's 70 percent interest. Petitioners, on the other hand, discounted the value by 35 percent for lack of marketability. Respondent has confused the discount for lack of marketability with a discount for minority interest. A discount for lack of marketability is warranted in this case because no established market exists for unlisted, closely held stock. Estate of Piper v. Commissioner,72 T.C. 1062, 1085 (1979). Respondent's argument that a control premium offsets the discount for lack of marketability is unfounded in the present case. Both parties valued decedent's 70 percent interest beginning with the value of 100 percent of the company. A "control premium" should be added to value determined from sales of minority interests. Petitioners, however, have not met their burden of proof that the appropriate discount is 35 percent. Based on the facts and circumstances in this case, we find that the proper discount for lack of marketability is 10 percent. Consequently, *39 the value of decedent's interest in Los Amigos at the date of his death was $ 465,000 ($ 378,000 (capitalized $ 210,000 earnings at 28.46 percent) x 90 percent (10 percent discount for lack of marketability) x 70 percent (ownership interest) = 465,000). The final issue remaining is whether the entire value of a $ 50,000 certificate of deposit ("CD") owned jointly by decedent, petitioner and petitioner's mother, is includable in decedent's gross estate. Petitioners contend that only $ 30,000 should be included in the estate because petitioner's mother, Rosa Perez ("Perez") provided adequate and full consideration in the amount of $ 20,000 toward the purchase of the CD. Petitioners assert that Perez had loaned decedent $ 20,000 prior to the time decedent purchased the CD and that decedent made Perez a joint tenant on the CD in consideration of the $ 20,000 loan. Respondent argues that the entire $ 50,000 is includable in decedent's gross estate pursuant to section 2040. Section 2040 [5] requires inclusion of jointly owned property in decedent's estate to the extent of decedent's interest in the property. Petitioners have the burden of proof to show if any part of the $ 50,000 should *40 be excluded from decedent's gross estate. Petitioners concede that the joint ownership was not a "qualified joint ownership" pursuant to section 2040(b). *41 Petitioners must show that Perez provided $ 20,000 consideration for her interest in the CD. To support their position, petitioners submitted the following evidence: (1) the CD showing that decedent, petitioner and Perez were joint owners; (2) petitioner's testimony that Perez loaned decedent $ 20,000; and (3) petitioner's testimony that decedent placed Perez' name on the CD in consideration for the $ 20,000 loan. Petitioners did not, however, call Perez to testify. Nor did they present tangible evidence of the loan transaction such as cancelled checks or loan documents. Petitioners did not explain these failures. The failure of a party to introduce evidence within its possession and which, if true, would be favorable to him, gives rise to a presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158 (1946), affd. 162 F.2d 513 (10th Cir. 1947). We find that on this issue petitioners have not sustained their burden of proof that respondent's determination is incorrect. We hold, therefore, that the entire $ 50,000 value of the CD is includable in decedent's gross estate. Decisions will be *42 entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated with this case: Ruben Rodriguez, Deceased and Zoila Rodriguez, docket No. 48430-86, Zoila Rodriguez, docket No. 20276-87.↩
2. All section references are to the Internal Revenue Code of 1954 as in effect at the date of the decedent's death or for the years at issue, as appropriate, unless otherwise indicated.↩
3. Hultquist initially valued the stock at $ 500,000 in a two-page report used on decedent's estate tax return.↩
4. Both Hultquist and respondent's expert used a study by Ibottson and Sinquefield to arrive at a capitalization rate of 28.46 percent. Hultquist rounded the 28.46 percent rate up to 30 percent "because of the unique business conditions" of Los Amigos.↩
5. SEC. 2040. JOINT INTERESTS. (a) GENERAL RULE. -- The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants with right of survivorship by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: Provided, That where such property or any part thereof, or part of the consideration with which such property was acquired, is shown to have been at any time acquired by such other person from the decedent for less than an adequate and full consideration in money or money's worth, there shall be excepted only such part of the value of such property as is proportionate to the consideration furnished by such other person: * * * (b) CERTAIN JOINT INTERESTS OF HUSBAND AND WIFE. -- (1) INTERESTS OF SPOUSE EXCLUDED FROM GROSS ESTATE. -- Notwithstanding subsection (a), in the case of any qualified joint interest, the value included in the gross estate with respect to such interest by reason of this section is one-half of the value of such qualified joint interest. (2) QUALIFIED JOINT INTEREST DEFINED. -- For purposes of paragraph (1), the term "qualified joint interest" means any interest in property held by the decedent and the decedent's spouse as -- (A) tenants by the entirety, or (B) joint tenants with right of survivorship, but only if the decedent and the spouse of the decedent are the only joint tenants.↩